# Authorities Published Only on an Electronic Database

**Thomas v. Butzen, Not Reported in F.Supp.2d (2005)**

2005 WL 2387676

2005 WL 2387676
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Janice THOMAS and Plaintiffs Y and Z,
Plaintiffs,
v.
Jean K. BUTZEN, President Lakefront
Supportive Housing and Lakefront SRO
Corporation, City of Chicago, Chicago
Housing Authority, an Illinois Municipal
Corporation, Chicago Housing Authority
Corporation, Inc.-the Housing Choice
Voucher Program, Cynthia Dean, Official
of Lakefront Supportive Housing and
Lakefront SRO Corporation, Helmut
Jahn, Architect, Lakefront SRO
Corporation & Supportive Housing, Carol
J. Wetmore, or current Chair, Board of
Directors, Lakefront SRO Corporation,
National Corporation for Supportive
Housing, Janice D. Schakowsky,
Congresswoman, State of Illinois and
United States Department of Housing
and Urban Development, Defendants.

No. 04 C 5555.
|
Sept. 26, 2005.

**Attorneys and Law Firms**

Janice Thomas, Chicago, IL, pro se.

Dana Lynn Hill, Seyfarth Shaw, Andrew S. Mine, Caroline K. Sheerin, City of Chicago, Law Department Corporation Counsel, Dallis James Rogers, George Joseph Brown, Chicago Housing Authority, Pamela Ingersol Cotten, Edward David Shapiro, Tina Marie Paries, Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., Marc Richard Kadish, Mayer, Brown, Rowe & Maw LLP, AUSA, United States Attorney's Office, NDIL, Ernest Yi Ling, United States Attorney's Office, Vihar R. Patel, Attorney General's Office, Alison Irene Abel, Thomas A. Ioppolo , Illinois Attorney General's Office, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

GUZMÁN, J.

**\*1** Janice Thomas and Plaintiffs Y and Z, proceeding *pro se,* have sued defendants Jean Butzen, the City of Chicago ("City"), Chicago Housing Authority ("CHA"),[1] Cynthia Dean, Helmut Jahn, Lakefront SRO Corporation ("Lakefront"), National Corporation for Supportive Housing, Carol Wetmore, United States Representative Janice Schakowsky, the State of Illinois and the United States Department of Housing and Urban Development ("HUD"), on behalf of themselves, and all others similarly situated, for defendants' alleged violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.,* the Quality Housing and Work Responsibility Act of 1998 ("QHWRA"), 42 U.S.C. §§ 1437c-1(d)(15), d(1)(6), d(1)(7), the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o), Executive Orders 11063 and 12982 and 42 U.S.C. §§ 1982, 1983 in connection with Lakefront's operation of its current facilities and its proposed construction of a new facility.[2] Defendants have filed a joint motion pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(1) and (b)(6) to dismiss the claims asserted against them. For the reasons set forth below, the Court grants the motion in part and denies it in part.

*The Legal Standard*

On motions to dismiss pursuant to Rule 12(b)(6) and Rule 12(b)(1), the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *United Phosphorus, Ltd. v. Angus Chem. Co.,* 322 F.3d 942, 946 (7th Cir.2002) (Rule 12(b)(1)); *Forseth v. Vill. of Sussex,* 199 F.3d 363, 368 (7th Cir.2000) (Rule 12(b)(6)). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

**Thomas v. Butzen, Not Reported in F.Supp.2d (2005)**

2005 WL 2387676

*Discussion*

*Anonymous Plaintiffs*

As an initial matter, we address the propriety of Plaintiffs Y and Z suing anonymously. Identification of parties is required both by Rule 10 and the First Amendment. *See Doe v. Stegall,* 653 F.2d 180, 185 (5th Cir.1981) ( "Public access to [party names] is more than a ... procedural formality; First Amendment guarantees are implicated when a court decides to restrict public scrutiny of judicial proceedings."). "The presumption that parties' identities are public information ... can be rebutted by showing that the harm to the plaintiff ... exceeds the likely harm from concealment." *Doe v. City of Chi.,* 360 F.3d 667, 669 (7th Cir.2004). The balance may tip in favor of concealment when the plaintiff is, among other things, a minor, a rape victim or "a likely target of retaliation by people who would learn her identity only from a judicial opinion or other court filing." *Id.* Plaintiffs Y and Z say they are suing anonymously because they fear retaliation. (*See* Compl. ¶ 8 (stating that plaintiffs Y and Z "shall be unnamed because they received death threats, false arrests ..., wrongful evictions, release of faked mental and medical health records and other discriminatory treatment at the hands of the site management")*.*) Yet, in their reply brief, Plaintiffs Y and Z are identified as Keith Richardson and Ethel Williams, respectively. (*See* Reply at 13.) Because Richardson and Williams are now publicly identified, the Court treats the complaint as if it had named them.

*Subject Matter Jurisdiction*

**\*2** Plaintiffs appear to assert four categories of claims: (1) those that seek to enjoin Lakefront's allegedly unlawful current operations; (2) those that seek damages for Lakefront's allegedly unlawful past operations; (3) those that contest Lakefront's alleged plan to perpetuate its unlawful conduct by opening a new facility; and (4) those that challenge as illegal or unconstitutional specific actions taken against Thomas. Plaintiffs have standing to pursue these claims only if they were injured by defendants' conduct and that injury is likely to be redressed by a decision in their favor. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Plaintiffs allege that Williams is a tenant of Lakefront but that Thomas and Richardson are not. (*See* Compl. ¶ 7;

Reply at 12-14 .) Because Thomas and Richardson do not live in a Lakefront facility, they are not injured by Lakefront's current operation of those facilities, even if it is unlawful. Consequently, only Williams has standing to pursue the first category of claims, seeking an injunction against Lakefront's enforcement of its current lease provisions and operational policies.

All three plaintiffs, however, have standing to sue for the second category of claims. To the extent defendants violated their rights while they allegedly were Lakefront tenants, plaintiffs can sue to recover damages for those injuries even though they no longer reside in a Lakefront facility. *Lujan,* 504 U.S. at 560-61.

The third category of claims, pertaining to the perpetuation of discrimination at the new building, is not ripe. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (quotation omitted). Plaintiffs' claims that Lakefront will perpetuate its alleged discrimination at the proposed new facility is based on their assumptions as to future events; that is, they assume that the proposed building will, in fact, be built and that the allegedly discriminatory policies in effect at other Lakefront facilities will be put into effect there. Unless and until those events occur, however, the new facility claims are not ripe. *Id.*

Moreover, even if those claims were ripe, none of the plaintiffs would have standing to pursue them. Plaintiffs do not allege that they are going to, or even that they are likely to, reside in the facility Lakefront plans to construct. Absent allegations that Lakefront's alleged discrimination at the new building will injure them personally, plaintiffs lack standing to pursue the new facility claims. *Lujan,* 504 U.S. at 560-61.

That leaves: (1) Williams' claim to enjoin Lakefront's allegedly illegally operation of its existing facilities; (2) all three plaintiffs' damage claims for rights violations they allegedly suffered while they were tenants of Lakefront; and (3) Thomas' claims that defendants violated her First Amendment rights by retaliating against her for publishing a newsletter, her Fourth Amendment rights by falsely arresting her and her Fourteenth Amendment[3] right to review documents prior to an eviction proceeding.[4] Plaintiffs assert these claims against Lakefront, Lakefront employees Jean Butzen, Cynthia Dean and Carol Wetmore, Helmut Jahn, the City, CHA, United States Representative Janice Schakowsky, the State of Illinois and HUD, and they seek monetary,

injunctive and declaratory relief.

**\*3** The State of Illinois contends that it is immune from plaintiffs' claims. Though the Eleventh Amendment generally gives states immunity from suit in federal court, *Darne v. Wisconsin Department of Revenue,* 137 F.3d 484, 487 (7th Cir.1998), there are exceptions to this rule:

> First, suits against state officials seeking prospective equitable relief for ongoing violations of federal law are not barred by the Eleventh Amendment. Second, individuals may sue directly a state when Congress has abrogated the immunity in unequivocal terms and pursuant to a valid exercise of its own power. Finally, a suit may be brought against a state directly when a state has waived its immunity and validly consented to suit in federal court.

*Id.* at 488. Plaintiffs' claims do not fall within any of these exceptions. Thus, their claims are barred by the Eleventh Amendment. *Id.*[5]

Congresswoman Schakowsky also contends that she is immune from plaintiffs' claims. The Court agrees. Plaintiffs seek to hold the Congresswoman liable for supporting public housing legislation. (*See* Compl. ¶ 10.) Such claims are barred by the Speech and Debate Clause of the Constitution. *See* U.S. Const., art. 1, § 6, cl. 1 ("[F]or any Speech or Debate in either House, [members of Congress] shall not be questioned in any other Place."); *Doe v. McMillan,* 412 U.S. 306, 311-12, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973) (stating that members of Congress are protected from suit arising from their activities within the "sphere of legitimate legislative activity," which includes voting on legislation) (quotation omitted). The claims against Congresswoman Schakowsky must, therefore, be dismissed.

HUD says that the doctrine of sovereign immunity shields it from this suit. Sovereign immunity protects the federal government and its agencies from being sued without their consent. *FDIC v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). The government can waive that immunity, but such a waiver "must be unequivocally expressed." *Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). There is no waiver of sovereign immunity for HUD in the FHA, the QHWRA, the Housing Choice Voucher Program or Executive Orders 11063 and 12982. Thus, any damages claims plaintiffs assert against HUD for its alleged violations of those statutes must be dismissed.

Sovereign immunity does not, however, shield HUD from any damages claims plaintiffs assert against it for violating 42 U.S.C. § 1982. *Baker v. F & F Inventory Co.,* 489 F.2d 829, 833 (7th Cir.1973) (stating that the "sue and be sued clause" of the National Housing Act, 12 U.S.C. § 1702 waives HUD's sovereign immunity for 42 U.S.C. § 1982 claims). The *Baker* decision has been criticized by courts outside of this circuit. *See, e.g., Selden Apartments v. U.S. Dep't of Hous. & Urban Dev.,* 785 F.2d 152, 156-59 (6th Cir.1986) (rejecting the reasoning of *Baker,* discussing contrary authority from other jurisdictions and holding that HUD is immune from 42 U.S.C. § 1982 suits for damages). In *Federal Deposit Insurance Corp. v. Citizens Bank & Trust Co. of Park Ridge,* 592 F.2d 364 (7th Cir.1979), the Seventh Circuit overruled another of *Baker's* holdings, that federal agencies subject to sue-and-be-sued provisions could be sued for torts not covered by the Federal Tort Claims Act. *Id.* at 371. But it did not reject *Baker's* holding that HUD was not immune from section 1982 claims. On the contrary, the court underscored the vitality of that holding, noting that it had previously "cited [the case] for its discussion of 42 U.S.C. ss 1981 and 1982." *See id.* at 371 n. 9 (citing *City of Milwaukee v. Saxbe,* 546 F.2d 693, 703 (7th Cir.1976)). In short, *Baker* remains the law of this circuit. Thus, HUD is not immune from plaintiffs' 42 U.S.C. § 1982 claims for damages.[6]

*Abstention*

**\*4** Even if jurisdiction exists, defendants urge us to abstain from exercising it under the *Younger* doctrine. That doctrine "forbids federal district courts to interfere with certain types of state court proceedings." *Lynk v. LaPorte Superior Court No. 2,* 789 F.2d 554, 558 (7th Cir.1986). To determine whether *Younger* abstention is proper, we must examine the relief sought in both cases to determine whether resolution of the federal court case "will unduly interfere with the ongoing state proceedings." *Am. Fed'n of State, County & Mun. Employees v. Tristano,* 898 F.2d 1302, 1305 (7th Cir.1990). Thomas is the sole plaintiff in the state court suit. (*See* Defs.' Mem. Supp. Joint Mot. Dismiss, Ex. C, First Am. Compl. Case No. 04-CH-3670.) She is suing Carolyn Stanley, a Lakefront employee, Lakefront, CHAC, CHA and Congresswoman Schakowsky. (*Id.* at 1-2.) She alleges that defendants evicted her in violation of state law and a City ordinance and wrongfully appropriated her mail. (*See id.* at 5-10 .) Thomas does not raise in that suit the federal claims she raises here. Because the claims raised in the two suits are distinct, resolution of this case will not interfere with the state court action. *See Am. Fed'n of State, County & Mun. Employees,* 898 F.2d at 1305 (holding that "the district court erred in dismissing the plaintiffs' claims based on *Younger* abstention" because "[t]he relief requested in

**Thomas v. Butzen, Not Reported in F.Supp.2d (2005)**

2005 WL 2387676

federal court, if granted, would not unduly interfere with the state proceedings"). Defendants' motion to dismiss on the grounds of *Younger* abstention is, therefore, denied.

*The Merits*

Plaintiffs contend that defendants' actions violated their rights under 42 U.S.C. § ("section") 1982, which states: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." To state a viable section 1982 claim, plaintiffs must allege that defendants "had a racial animus, intended to discriminate against the plaintiff[s] and deprived [them] of protected rights because of [their] race." *Whisby-Myers v. Kiekenapp,* 293 F.Supp.2d 845, 850 (N.D.Ill.2003). The only right protected by section 1982 that is even arguably implicated by plaintiffs' complaint is the right to lease property. Read favorably to plaintiffs, their complaint alleges that Lakefront terminated their leases or otherwise subjected them to unfavorable lease terms solely because of their race and that CHA and HUD participated in, or condoned, Lakefront's conduct. Plaintiffs do not allege, however, that the City, the National Corporation for Supportive Housing ("NCSH"), or Jahn, Butzen, Dean or Wetmore, individually, did anything to deprive them of their right to lease property. Accordingly, any section 1982 claims asserted against those defendants is dismissed.

Any section 1982 claims that plaintiffs assert against Butzen, Dean and Wetmore in their official capacities must also be dismissed. Asserting a claim against an employee in her official capacity is the same as suing the entity that employs her. *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Any official capacity claims asserted against these defendants are redundant of Thomas' claims against their employer, Lakefront. Accordingly, any section 1982 official capacity claims asserted against Butzen, Dean and Wetmore are also dismissed.

**\*5** The rest of plaintiffs' claims are grounded in section 1983. That statute provides redress for people whose federal rights are violated "under color of state law." 42 U.S.C. § 1983. HUD, as a federal agency, acts under color of federal law. Thus, it is not subject to section 1983. *City of Milwaukee,* 546 F.2d at 703 (7th Cir.1976) ("We agree ... that, insofar as City complains of acts done by the defendants under color of federal law rather than state law, § 1983 does not apply.")[7]

The bulk of plaintiffs' remaining section 1983 claims are grounded in defendants' alleged violations of section 3608(e)(5) of the FHA, section 1437c-1(d)(15) of the QHWRA, the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o), and Executive Orders 11063 and 12892. Defendants say that none of these statutes creates rights that can be vindicated through section 1983.

Plaintiffs, relying primarily on *Wallace v. Chicago Housing Authority,* 298 F.Supp.2d 710 (N.D.Ill.2003), disagree. The plaintiffs in *Wallace* were CHA residents who were subject to relocation when CHA demolished their high-rise buildings. *Id.* at 714. The *Wallace* plaintiffs claimed that CHA failed to provide them with adequate relocation services or gave them services that steered them into neighborhoods that were predominantly African-American. *Id.* Plaintiffs claimed that CHA's actions violated, among other laws, section 3608(e)(5) of the FHA, section 1437c-1(d)(15) of the QHWRA and Executive Orders 11063 and 12892. *Id.* at 715.

Section 3608(e)(5) of the FHA requires the Secretary of HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." 42 U.S.C. § 3608(e)(5). Section 1437c-1(d)(15) of the QHWRA requires public housing agencies like CHA to submit a plan to HUD every five years that contains, among other things, the agency's certification that it "will affirmatively further fair housing." 42 U.S.C. § 1437c-1(d)(15). Executive Orders 11063 and 12892, respectively, require the heads of federal agencies to "take all action necessary and appropriate to prevent discrimination because of race, color, creed, or national origin [with respect to housing]" and to "ensur[e] that [their] programs and activities relating to housing and urban development are administered in a manner affirmatively to further the goal of fair housing." Executive Order 11063, 27 Fed.Reg. 11527 (Nov. 20, 1962); Executive Order 12892, 59 Fed.Reg. 2939 (Jan. 17, 1994).

In *Wallace,* CHA moved to dismiss plaintiffs' claims, arguing that none of those provisions creates rights cognizable under section 1983. *Wallace,* 289 F.Supp.2d at 717. The Wallace Court disagreed. A statute confers an enforceable right, this Court held, if: plaintiffs were the intended beneficiaries of the provision, the right allegedly conferred is not " 'so vague and amorphous' that its enforcement would strain judicial competence" and the provision is couched in mandatory terms. *Id.* at 717 n. 3 (quoting *Blessing v. Freestone,* 520 U.S. 329, 340-41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)). In the Wallace Court's view, all of the provisions cited by plaintiffs

create rights that can be enforced through a section 1983 suit. *See id.* at 718-21.

**\*6** In reaching this conclusion, The Court relied heavily on *Langlois v. Abington Housing Authority,* 234 F.Supp.2d 33 (D.Mass.2002). *See Wallace,* 289 F.Supp.2d at 718 ("As discussed in more detail below, we agree with the court's reasoning in *Langlois* ....").) In *Langlois,* a group of Massachusetts housing authority residents brought section 1983 claims against those agencies for their alleged violations of section 3608(e)(5) of the FHA, section 1437c-1(d)(15) of the QHWRA and Executive Orders 11063 and 12892 in their administration of federal housing programs. *Langlois,* 234 F.Supp.2d at 37, 46. As in *Wallace* and the instant case, the defendants in *Langlois* moved to dismiss on the grounds that those provisions did not confer enforceable rights. *Id.* at 37.

The *Langlois* court did not substantively address section 1437c-1(d)(15) of the QHWRA, because it was not in effect at the time of the contested conduct, but held that section 3608(e)(5) of the FHA creates enforceable rights and, because they are incorporated into the FHA, the Executive Orders do as well. *Id.* at 70-78. In the court's words:

> Section 3608(e)(5) ... meets the *Blessing* criteria. It could not be clearer from the statute, the legislative history, and the case law construing it that this provision was intended to benefit the plaintiffs here: people in desperate need of access to fair housing, minorities and the poor.
>
> Nor is the duty to affirmatively further too vague and amorphous for the courts to enforce. Essentially, as the Court in *Blessing* noted, this is an issue of judicial competence. As noted above, it is an antidiscrimination statute and few discrimination statutes are more specific. Judicial decisions and administrative regulations have given content to these provisions over the past twenty years.... The final *Blessing* criterion-whether the statutory language at issue imposes an unambiguous and binding obligation on the state-is also met here. The language of the statute is mandatory: it provides that the Secretary "shall" administer the relevant programs in a manner affirmatively to further the policies of the statutory subchapter.

*Id.* at 72-73 (citation omitted). The *Wallace* court adopted this analysis almost verbatim:

> [W]e believe that the provisions § 3608(e)(5) of the Fair Housing Act easily pass the *Blessing* test. *See Langlois,* 234 F.Supp.2d at 71-72. At issue in this case is the first prong of the *Blessing* test, because there is

little dispute that the language of the act is mandatory; nor can the parties seriously contend that a claim under the Fair Housing Act strains judicial competence.... With respect to this first prong, we agree with the *Langlois* court that "[i]t could not be clearer from the statute, the legislative history, and the case law construing it, that [§ 3608(e)(5) ] was intended to benefit the plaintiffs here: people in desperate need of access to fair housing, minorities and the poor." *Id.* at 72.... Thus, for the foregoing reasons, we hold that Plaintiffs may sue under § 1983 to combat a violation of § 3608(e)(5) of the Fair Housing Act.

**\*7** *Wallace,* 298 F.Supp.2d at 719.

With due respect to those courts, we believe that the *Langlois* and *Wallace* decisions do not comport with *Blessing* and run counter to the trend of Supreme Court authority in this area. In particular, *Langlois* and *Wallace* give short shrift to the second part of the *Blessing* test: whether "the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence." *Blessing,* 520 U.S. at 340-41 (quotation omitted). About that part of the test, the *Blessing* Court said:

> [T]he lower court's holding that Title IV-D "creates enforceable rights" paints with too broad a brush. It was incumbent upon respondents to identify with particularity the rights they claimed, since it is impossible to determine whether Title IV-D, as an undifferentiated whole, gives rise to undefined "rights." Only when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights.
>
> In prior cases, we have been able to determine whether or not a statute created a given right because the plaintiffs articulated, and lower courts evaluated, well-defined claims. In *Wright,* for example, we held that tenants of public housing projects had a right to have their utility costs included within a rental payment that did not exceed 30 percent of their income. We did not ask whether the federal housing legislation generally gave rise to rights; rather, we focused our analysis on a specific statutory provision limiting "rent" to 30 percent of a tenant's income. Similarly, in *Wilder,* we held that health care providers had an enforceable right to reimbursement at "reasonable and adequate rates" as required by a particular provision in the Medicaid statute. And in *Suter v. Artist M.,* where we held that Title IV-E of the Social Security Act did not give the plaintiffs the right that they asserted, we again analyzed the claim in very specific terms:

**Thomas v. Butzen, Not Reported in F.Supp.2d (2005)**

2005 WL 2387676

whether children had a right to have state authorities undertake "reasonable efforts to prevent removal of children from their homes and to facilitate reunification of families where removal had occurred." Finally, in *Livadas,* we discerned in the structure of the National Labor Relations Act (NLRA) the very specific right of employees "to complete the collective-bargaining process and agree to an arbitration clause." We did not simply ask whether the NLRA created unspecified "rights."

*Id., 520 U.S. at 342-43* (citations omitted). The *Langlois* court's reduction of this part of the test to "[e]ssentially ... an issue of judicial competence," *see Langlois,* 234 F.Supp.2d at 73, is a gross oversimplification.

*Blessing'* s insistence that section 1983 plaintiffs identify specific rights that they contend are conferred by a statute is just one of a series of qualifications that the Court has added to the creation-of-rights analysis since its appearance in *Wilder v. Virginia Hospital Association,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). The *Wilder* Court said that a federal statute creates an enforceable right if "the provision ... was intend [ed] to benefit the putative plaintiff," it reflects a "binding obligation on the governmental unit" and the asserted right is not "too vague and amorphous such that it is beyond the competence of the judiciary to enforce." *Id .* at 509 (quotations omitted). The *Wilder* Court applied that test to the Boren Amendment, which conditioned states' receipt of federal Medicaid funds on their submission to the Secretary of Health and Human Services ("HHS") of a plan that provided for payments to medical service providers that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." *Id.* at 502-03. The Court concluded that the medical service providers were the "intended beneficiaries of the Boren Amendment" because it explicitly requires state plans to provide for payment to them. *Id.* at 510. The Court also said that the Amendment reflected a binding obligation because it requires, rather than permits, state plans to provide for reasonable payments. *Id.* at 512. Moreover, the Court said,

**\*8** [t]hat the amendment gives the States substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the amendment, but it does not render the amendment unenforceable by a court. While there may be a range of reasonable rates, there certainly are *some* rates outside that range that no State could ever find to be reasonable and adequate under the Act. Although some knowledge of the hospital industry might be required to evaluate a State's findings with respect to the

reasonableness of its rates, such an inquiry is well within the competence of the Judiciary.

*Id.* at 519-20 (footnote omitted). Thus, the Court concluded that "the Act creates a right enforceable by health care providers under § 1983 to the adoption of reimbursement rates that are reasonable and adequate to meet the costs of an efficiently and economically operated facility that provides care to Medicaid patients." *Id.* at 509-10.

Not long after it was decided, the Court started to back away from *Wilder.* Two years later, the Court decided *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), a case in which children who are or were wards of the Illinois Department of Children and Family Services sued the agency under section 1983 for its alleged violation of the Adoption Assistance and Child Welfare Act. *Id.* at 350-53. That statute enables a state to be reimbursed for a percentage of foster care and adoption assistance costs if it submits a plan to the Secretary of HHS certifying that " 'reasonable efforts will be made ... to prevent or eliminate the need for removal of the child from his home, and ... to make it possible for the child to return to his home." ' *Id.* at 351 (quoting 42 U.S.C. § 671(a)(15)). The plaintiff-children said that provision of the statute conferred upon them a right to have the State make reasonable efforts to keep them in and return them to their homes. *Id.* at 352-53.

The similarities between the statute at issue in *Wilder* and that at issue in *Artist M.* are striking: both are funding statutes enacted under Congress' spending power, both frame the state agencies' obligation in terms of reasonableness and neither defines "reasonable." Yet, the *Artist M.* Court reached the opposite result. *Id.* at 350. The Adoption Act, the Court said, does not require the states to have plans certifying that they will use reasonable efforts to keep the children in or return them to their homes. *Id.* at 358. Rather, the Court said, the statute simply requires the states to "have a plan approved by the Secretary [of HHS] which contains the 16 listed features." *Id.* But the same could be said of the statute at issue in *Wilder,* which the *Artist M.* Court did not mention in this section, because it requires the states to submit a Medicaid plan that contains some or all of each of 50 listed features. *Compare* 42 U .S.C. § 671(a) (construed in *Artist M.*), *with* 42 U.S.C. § 1396a (1990) (construed in *Wilder* ).

**\*9** Moreover, when the Court did distinguish *Wilder,* as the dissenters noted, its reasoning was less than compelling. *See* 503 U.S. at 365. The Medicaid legislation was different from the Adoption Act, the Court said, because the former "set forth in some detail the factors to

**Thomas v. Butzen, Not Reported in F.Supp.2d (2005)**

2005 WL 2387676

be considered" in determining reasonable reimbursement rates while the latter contained "[n]o further statutory guidance ... as to how 'reasonable efforts' [to keep children in their homes] are to be measured." *Id.* at 359-60. In reality, the "detail [ed] ... factors" set forth in the Medicaid statute are broad considerations that do little to inform the reasonableness determination. *See Wilder,* 496 U.S. at 519 n. 17 (listing the considerations as: "(1) the unique situation (financial and otherwise) of a hospital that serves a disproportionate number of low income patients, (2) the statutory requirements for adequate care in a nursing home, and (3) the special situation of hospitals providing inpatient care when long-term care at a nursing home would be sufficient but is unavailable.").

The conflict between *Wilder* and *Artist M.* did not go unnoticed by Justices Blackmun and Stevens, who dissented from the opinion:

> [T]he Court's conclusion is plainly inconsistent with this Court's decision just two Terms ago in *Wilder v. Virginia Hospital Assn.,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), in which we found enforceable under § 1983 a functionally identical provision of the Medicaid Act requiring "reasonable" reimbursements to health-care providers. More troubling still, the Court reaches its conclusion without even stating, much less applying, the principles our precedents have used to determine whether a statute has created a right enforceable under § 1983.

503 U.S. at 365. But the retreat from *Wilder* continued.

In 1997, the Court decided *Blessing.* 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569. In that opinion, the Court adhered to the three-part test announced in *Wilder* but, as discussed above, required that the right allegedly created be specifically defined. *Id.* at 342-43.

In 2002, the Court refined the test even further in *Gonzaga University v. Doe,* 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). In that case, a graduate of Gonzaga sued the school for its disclosure to a state agency that he was under investigation for sexual misconduct. *Id.* at 277. Plaintiff claimed that the University's actions violated the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, which prohibits federal funding of schools that have a practice of releasing education records to unauthorized persons. *Id.* at 276-77. Relying on *Wilder* and *Blessing,* plaintiff argued that there is "a relatively loose standard for finding rights enforceable by § 1983." *Id.* at 282. A statute creates such a right, he argued, "so long as Congress intended that the statute 'benefit' putative plaintiffs." *Id.*

After acknowledging that its opinions "might be read to suggest that something less than an unambiguously conferred right is enforceable by § 1983," *id.* at 282, the Court said: "We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.* at 283. Further, the Court "reject[ed] the notion that [its] implied right of action cases are separate and distinct from [its] § 1983 cases." *Id.* A court's role, in both contexts, the Court said, is to "determine whether Congress intended to create a federal right." *Id.* (emphasis omitted). Thus, the Court concluded, "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286.

**\*10** The *Langlois* and *Wallace* courts do not analyze this line of cases in depth or remark on the Supreme Court's steady retreat from *Wilder,* Moreover, though the *Wallace* court does discuss *Gonzaga,* it concludes that the reasoning of the case is limited to statutes enacted pursuant to Congress' spending power. *Wallace,* 289 F.Supp.2d at 718. But the opinion contains no such limitation. Rather, it says that a statute can support a section 1983 claim only if it unambiguously confers an individual right, a standard that spending power statutes are highly unlikely to meet. *Gonzaga,* 536 U.S. at 280-86.

Given the jurisprudence in this area, this Court is required to follow the *Wilder* test as modified by *Blessing* and *Gonzaga* and determine whether the text and structure of any of the statutes cited by plaintiff indicate that Congress intended to create enforceable rights.

The text and structure of the FHA clearly evince Congress' intent that section 3608(e)(5) not confer an enforceable, individual right. The statute contains an express right of action that permits any "aggrieved person [to] commence a civil action ... not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice ... to obtain appropriate relief with respect to such discriminatory housing practice...." 42 U.S.C. § 3613. The statute defines "discriminatory housing practice" as an act that is unlawful under sections 3604 [, which governs discrimination in the sale or rental of housing], 3605 [, which governs discrimination in residential real estate-related transactions], 3606 [,which governs discrimination in provision of brokerage services] or 3617 [which prohibits coercion and intimidation of people who exercise their FHA rights]...." 42 U.S.C. § 3602(f). A housing authority's failure to further fair housing is not a discriminatory housing practice actionable under section

**Thomas v. Butzen, Not Reported in F.Supp.2d (2005)**

2005 WL 2387676

3613, nor is it the subject of a separate cause of action in the statute. The existence of an express cause of action in the FHA that does not encompass section 3608(e)(5) strongly suggests that Congress did not intend section 3608(e)(5) to create enforceable rights.

The language of section 3608, itself, bolsters that conclusion. The title of that section is "Administration." Subsection e, which is entitled "Functions of the Secretary," contains a laundry list of the Secretary's duties, such as making studies and publishing reports about the state of housing discrimination. The duty upon which plaintiffs seize is fifth in this list: "[to] administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." 42 U.S.C. § 3608(e)(5). The fact that this duty appears in a section devoted solely to HUD's ministerial duties sharply undercuts plaintiffs' claim that Congress intended that duty to confer enforceable rights on them.

**\*11** Moreover, the right allegedly conferred by section 3608(e)(5) is " '[too] vague and amorphous" ' to be enforceable. *See Blessing, 520 U.S. at 340-41.* That section does not define HUD's duty to further fair housing or place any parameters on it. If violations of that duty could be redressed via section 1983, virtually any act or omission of HUD with respect to housing would be subject to judicial review. Neither the federal nor the state judicial system has the authority, resources or expertise to become HUD's overseer, the position plaintiffs' interpretation of section 3608(e)(5) would impose on them.

In short, there is nothing in section 3608(e)(5) in particular, or the FHA in general, that suggests Congress intended for HUD's duty to further fair housing to confer enforceable rights on individuals like plaintiffs. Plaintiffs' section 1983 claims based on that section are, therefore, dismissed with prejudice.

Plaintiffs' section 1983 claims grounded in section 1437c-1(d)(15) of the QHWRA suffer the same fate. Section 1437c-1 requires public housing agencies, like CHA, to submit to HUD every five years a plan that includes the agency's mission statement for serving the needs of the low-income families in its jurisdiction and a statement of the goals and objectives that will enable it to serve those needs. 42 U.S.C. § 1437c-1(a). The section sets forth the required contents of those plans, including "[a] certification by the public housing agency that [it] ... will affirmatively further fair housing." *Id.* § 1437c-1(d)(15).

Like section 3608(e)(5) of the FHA, section 1437c-1(d)(15) of the QHWRA does not suggest Congressional intent to confer enforceable rights on plaintiffs. *See id.* The section says nothing about a private right of action, and its focus is on public housing agencies' responsibility to report to HUD, not on their responsibilities to their tenants. Moreover, the duty QHWRA imposes on CHA to further fair housing is, like HUD's FHA duty to do the same, too vague to be enforced. Accordingly, plaintiffs' section 1983 claims based on section 1437c-1(d)(15) are dismissed with prejudice.

The same is true for plaintiffs' claims grounded in Executive Orders 11063 and 12982. Because those Orders simply reiterate HUD's duty to affirmatively further fair housing, those orders cannot support section 1983 claims.[8]

Plaintiffs fare no better with their claims based on the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o). That section appears in a chapter devoted primarily to establishing the financial arrangements between HUD and public housing authorities. *See generally* 42 U.S.C. § 1437, *et seq.* Section 1437f(o) authorizes the Secretary of HUD to "provide assistance to public housing agencies for tenant-based assistance" based on specified payment standards. 42 U.S.C. § 1437f(o)(1)(A), (B). Among other things, that section sets the amount of the monthly assistance payment to eligible families, sets eligibility standards for participants and dictates the quality of the housing covered by the program. *See generally* 42 U.S.C. § 1437f(o). That section does not create a private right of action or contain any indication that Congress intended it to confer enforceable rights on plaintiffs. Thus, plaintiffs' section 1983 claims based on section 1437f(o) are dismissed with prejudice.

**\*12** Plaintiffs also seek section 1983 relief for defendants' alleged violations of 42 U.S.C. § 1437d(1)(6) and (7). Those sections require that public housing leases contain the following provisions:

> [A]ny criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy.

> [W]ith respect to any notice of eviction or termination, notwithstanding any State law, a public housing tenant shall be informed of the opportunity, prior to any hearing or trial, to examine any relevant documents, records, or regulations directly related to the eviction or

2005 WL 2387676

termination. 42 U.S.C. § 1437d(1)(6), (7).

Even if this section confers an enforceable right on plaintiffs, an issue we do not decide, that right would be to have a lease that contains the recited provisions. Plaintiffs allege that Lakefront violated those lease provisions, not that it failed to include them in its leases. (*See* Compl. ¶ 34.) Thus, plaintiffs could not state viable section 1983 claims against Lakefront for violating sections 1437(d)(1)(6) and (7) even if those sections conferred enforceable rights on them. *See Edwards v. Dist. of Columbia,* 821 F.2d 651, 653 n. 2 (D.C.Cir.1987) (noting that "the only rights created by § 1437d(1) itself are rights to a lease" that incorporates the enumerated provisions).

That leaves Thomas' section 1983 claims for violation of her First, Fourth and Fourteenth Amendment rights. Plaintiff alleges that these rights were violated when she was harassed, evicted and arrested in retaliation for her publication of a newsletter and denied access to relevant documents prior to a state-court eviction proceeding. (*See* Compl. ¶ 34; Reply at 12.) Thomas does not allege that NCSH, the City or CHA had any involvement in those actions or that their policies or practices caused her alleged injuries. *See Iskander v. Vill. of Forest Park,* 690 F.2d 126, 128 (7th Cir.1982) (stating that both private and public corporations can be held liable under section 1983 only if their customs or policies caused the constitutional deprivation). Thus, to the extent she asserts her First, Fourth and Fourteenth Amendment claims against NCSH, the City or CHA those claims are dismissed.[9]

Thomas has also not alleged any basis for holding the individual defendants personally liable for these claims. "[S]ection 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in [the wrongful conduct]." *Rasche v. Vill. of Beecher,* 336 F.3d 588, 597 (7th Cir.2003) (quotation omitted). Thomas has not alleged that defendants Butzen, Jahn, Dean or Wetmore personally took any action to violate her rights. (*See* Compl. ¶ 6(1), (5), (6), (8).) Any claims she asserts against those defendants in their individual capacities are, therefore, dismissed.

**\*13** Moreover, for the reasons stated above, if defendants Butzen, Dean and Wetmore are sued only in their official capacities, those claims must also be dismissed. *See Graham,* 473 U.S. at 165 (stating that official capacity claims are redundant of claims against employer).

That leaves defendant Lakefront. To state viable section 1983 claims against this defendant, Thomas must allege that Lakefront, acting under color of law, deprived her of a constitutional right pursuant to one of its policies or customs. *See* 42 U.S.C. § 1983; *Iskander,* 690 F.2d at 128. Thomas alleges that CHA has delegated its authority to provide low-income housing to Lakefront and/or controls Lakefront's housing operations. (*See* Compl. ¶¶ 19, 25.) Thus, she has sufficiently alleged that Lakefront acted under color of state law. *See Wade,* 83 F.3d at 905.

She has not, however, alleged that Lakefront violated her First Amendment rights pursuant to one of its policies or customs. Though Thomas claims that Lakefront harassed, arrested and evicted her for publishing a newsletter about the tenants' concerns, (*see* Compl. ¶ 34; Reply at 12), she does not allege that Lakefront has a policy of retaliating against tenants who exercise their First Amendment rights. Absent such allegations, Thomas' First Amendment claim must be dismissed.

Her Fourteenth Amendment claim suffers the same fate. The Fourteenth Amendment requires that "a person not be deprived of property without notice and an opportunity for a hearing." *Siebert v. Severino,* 256 F.3d 648, 659 (7th Cir.2001) (quotation omitted). The state-court eviction proceeding, in which plaintiff participated, (*see* Defs.' Mem. Supp. Joint Mot. Dismiss, Ex. B, 3/17/00 Order denying Thomas' motion to vacate judgment of eviction),[10] provided her with all of the process she was constitutionally due. *See Johnson v. Ill. Dep't of Public Aid,* 467 F.2d 1269, 1273 (7th Cir.1972) ( "Our examination of the Illinois Forcible Entry and Detainer Act ... indicates that it adequately provides the remaining plaintiffs with procedural due process."). Thus, Thomas cannot state a Fourteenth Amendment claim against Lakefront.

In her last section 1983 claim, Thomas alleges that Lakefront wrongfully arrested her. (*See* Reply at 12.) An essential element of a false arrest claim is the lack of probable cause. *Schertz v. Waupaca County,* 875 F.2d 578, 581 (7th Cir.1989). Thomas alleges that Lakefront arrested her, or caused her to be arrested, in retaliation for publishing a newsletter. (Reply at 12.) Moreover, she says Lakefront routinely causes its tenants to be arrested on false charges. (*Id.* at 10.) Taken together, those allegations are sufficient to state a section 1983 false arrest claim against Lakefront.[11]

To summarize:

(1) Plaintiffs' claims contesting the operation of Lakefront's proposed new building are not ripe and, even if they were, plaintiffs have not alleged that they have standing to pursue them. Accordingly, those

**Thomas v. Butzen, Not Reported in F.Supp.2d (2005)**

2005 WL 2387676

claims are dismissed for lack of subject matter jurisdiction;

**\*14** (2) Plaintiffs Richardson and Thomas have no standing to assert any claims concerning the current operation of Lakefront's current facilities. Thus, any such claims they assert are dismissed for lack of subject matter jurisdiction;

(3) The State of Illinois is immune from the claims plaintiffs assert against it. Those claims, are, therefore, dismissed for lack of subject matter jurisdiction;

(4) Congresswoman Schakowsky is immune from plaintiffs' claims. The claims asserted against her are dismissed for lack of subject matter jurisdiction;

(5) HUD is immune from any section 1983 damage claims plaintiffs assert against it. Consequently, any such claims are dismissed for lack of subject matter jurisdiction;

(6) HUD does not act under color of state law. Thus, any section 1983 claims plaintiffs assert against it for non-monetary relief are dismissed with prejudice;

(7) Any section 1983 claims grounded in Section 3608(e)(5) of the FHA, section 1437c-1(d)(15) of the QHWRA, the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o), and Executive Orders 11063 and 12892 that plaintiffs assert against Lakefront, NCSH, the City, CHA, Wetmore, Dean, Butzen and Jahn are dismissed with prejudice;

(8) Any section 1982 claims plaintiffs assert against NCSH, the City, Jahn, Butzen, Dean and Wetmore, individually, are dismissed without prejudice;

(9) Any section 1982 claims plaintiffs assert against Butzen, Dean and Wetmore in their official capacities are dismissed with prejudice;

(10) Any section 1983 claims that Thomas asserts against NCSH, the City or CHA or against Butzen, Jahn, Dean or Wetmore in their personal capacities for violations of her First or Fourth Amendment rights are dismissed without prejudice;

(11) Any section 1983 claims that Thomas asserts

against Butzen, Jahn, Dean or Wetmore in their official capacities for violations of her First or Fourth Amendment rights are dismissed with prejudice.

(12) Any section 1983 claim that Thomas asserts against Lakefront for violations of her First Amendment rights is dismissed without prejudice;

(13) Any section 1983 claims that Thomas asserts against Lakefront, NCSH, the City, CHA, Butzen, Dean, Jahn or Wetmore for violations of her Fourteenth Amendment rights are dismissed with prejudice;

(14) Plaintiffs' request that the Court enjoin the Chicago City Council and the Illinois Legislature from enacting legislation with respect to Lakefront's proposed new facility are stricken; and

(15) Defendant CHAC, which has not been served in the year since this case was filed, is dismissed without prejudice for lack of timely service.

The only claims that remain in this suit are Thomas' section 1982 claims against HUD, CHA and Lakefront and her section 1983 claim against Lakefront for false arrest.

*Conclusion*

For the reasons stated above defendants' joint motion to dismiss [doc. no. 49] is granted in part and denied in part. Defendant CHAC is dismissed without prejudice for lack of timely service. Plaintiffs have fourteen days from the date of this Memorandum Opinion and Order to amend their complaint in accordance with this Order. If plaintiffs do not do so within that time period, the Court will assume they do not wish to pursue the dismissed claims and will dismiss them with prejudice.

**\*15** SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2387676

Footnotes

1    Plaintiffs have also named Chicago Housing Authority Corporation, Inc.-Housing Choice Voucher Program ("CHAC") as a defendant. This defendant has not been served in the year since this case was filed. Thus, the Court dismisses CHAC as a party pursuant to Rule 4 for lack of timely service.

**Thomas v. Butzen, Not Reported in F.Supp.2d (2005)**

2005 WL 2387676

2    The Court notes that while plaintiffs sue for violations of these specific laws, they do not state that they seek review of any agency action pursuant to the Administrative Procedures Act, 5 U.S.C. § 706(2). Even if they had, their complaints are too amorphous to pinpoint any particular agency action upon which to base such a claim.

3    All three plaintiffs attempt to assert that defendants have violated their equal protection rights as guaranteed under the Fourteenth Amendment regarding the municipal set-aside program ordinance, Cook County, Ill., Ordinance 88-0-29 (May 2, 1988), as amended, which requires a minimum percentage of the total value of any county construction contract to be awarded to minority business enterprises ("MBEs"). However, they fail to allege that any of them have qualified to be an MBE such that any of the plaintiffs would have standing to sue as to this claim.

4    Thomas actually grounds this claim in 42 U.S.C. § 1437(d)(1)(7). As explained below, however, that statute does not confer on her a right to review documents prior to being evicted. Thus, we have construed this claim as being brought under the Fourteenth Amendment.

5    Even if the State were not immune, we would have no power to enjoin the State Legislature, or any other legislative body, from enacting legislation pertaining to Lakefront's proposed facility. *See New Orleans Water Works Co. v. City of New Orleans,* 164 U.S. 471, 481, 17 S.Ct. 161, 41 L.Ed. 518 (1896) ("[A] court of equity cannot properly interfere with, or in advance restrain, the discretion of a municipal body while it is in the exercise of powers that are legislative in their character."). Thus, plaintiffs' requests for such injunctions are stricken.

6    Defendants also argue the Court lacks jurisdiction because plaintiffs have not alleged that they acted under color of state law or participated in any constitutional deprivations. (*See* Mem. Supp. Defs.' Joint Mot. Dismiss at 10-15.) Those arguments, however, go to the merits of plaintiffs' claims not the Court's jurisdiction over them. Thus, they are discussed in the merits section.

7    Like HUD, the State could not be sued under sued under section 1983, even if it did not have sovereign immunity. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that states are not among the class of persons subject to suit under section 1983).

8    Given our conclusion that these orders do not confer any rights on plaintiffs, we need not address the issue of whether these Executive Orders are properly construed as laws of the United States for the purposes of section 1983. *Cf. Local 1498, Am. Fed'n of Gov't Employees v. Am. Fed'n of Gov't Employees, AFL/CIO,* 522 F.2d 486, 491 (5th Cir.1975) (noting that an Executive Order issued "pursuant to [Congressional] authority providing for presidential implementation or effectuation of statutory provisions" can constitute "a law of the United States," for purposes of jurisdictional statute, but one issued solely pursuant to executive authority cannot).

9    In addition, section 1983 only prohibits actions taken "under color of state law." 42 U.S.C. § 1983. In certain circumstances private actors like NCSH will be deemed state actors but only if the state "effectively directs, controls, or encourages the actions of [the] private party" or if it "delegates a public function to [the] private entity." *Wade v. Byles,* 83 F.3d 902, 905 (7th Cir.1996) (quotations omitted). Plaintiffs do not allege that either of those circumstances applies to NCSH.

**Thomas v. Butzen, Not Reported in F.Supp.2d (2005)**

2005 WL 2387676

10      Because the Court can take judicial notice of the court order, we can consider it on this motion to dismiss without converting it to a summary judgment motion. *See Henson v. CSC Credit Servs.,* 29 F.3d 280, 284 (7th Cir.1994) ("[T]he district court may ... take judicial notice of matters of public record without converting a 12(b)(6) motion into a motion for summary judgment.") (quotation omitted).

11      Defendants say the statute of limitations is an independent basis for dismissing the section 1982 and 1983 claims. (*See* Mem. Supp. Def.'s Joint Mot. Dismiss at 13.) Untimeliness, however, is an affirmative defense that is not appropriate for adjudication on a Rule 12 motion. *Reiser v. Residential Funding Corp.,* 380 F.3d 1027, 1030 (7th Cir.2004).

---

**End of Document**      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Ingram v. Illinois Dept. of Corrections, Not Reported in F.Supp.2d (2011)

2011 WL 1519623

KeyCite Yellow Flag
Distinguished by Commings v. Flowers, S.D.Ill., January 28, 2013
2011 WL 1519623
Only the Westlaw citation is currently available.
United States District Court,
S.D. Illinois.

Carmela INGRAM as Mother and Next
Friend of minors, TI, DI, BI, JI and QI,
Plaintiff,
v.
ILLINOIS DEPARTMENT OF
CORRECTIONS and David Rednour in
his individual capacity as Warden of the
Menard Correctional Center, Defendants.

Civil No. 10–933–GPM.
|
April 20, 2011.

**Attorneys and Law Firms**

Benjeman L. Nichols, Cavanagh Law Group, Chicago, IL,
for Plaintiff.

Christopher L. Higgerson, Illinois Attorney General's
Office, Springfield, IL, for Defendants.

*MEMORANDUM AND ORDER*

MURPHY, District Judge.

**\*1** This is an action under the Illinois Wrongful Death
Act, 740 ILCS 180/0.01 *et seq.,* and the Illinois Survival
Act, 755 ILCS 5/27–6. Plaintiff Carmela Ingram brings
suit in connection with the death of her husband James
Ingram on behalf of herself and as next friend of Mr. and
Mrs. Ingram's minor children TI, DI, BI, JI, and QI.
According to the allegations of Mrs. Ingram's complaint,
on June 26, 2010, Mr. Ingram, who was incarcerated at
the time in the Menard Correctional Center ("Menard") in
Chester, Illinois, died of hyperthermia as a result of being

confined in isolation in an overheated cell without
adequate monitoring by guards. Named as Defendants in
the case are the Illinois Department of Corrections
("IDOC") and David Rednour, the warden of Menard.
Count I and Count II of Mrs. Ingram's complaint assert
claims for negligence against the IDOC and Rednour
pursuant to, respectively, the Wrongful Death Act and the
Survival Act. Count III and Count IV of the complaint
assert claims for willful and wanton negligence against
the IDOC and Rednour pursuant to, respectively, the
Wrongful Death Act and the Survival Act. Finally, Count
V asserts a claim under 42 U.S.C. § 1983 against the
IDOC and Rednour in his individual capacity. This case is
before the Court on a motion for dismissal for failure to
state a claim upon which relief can be granted of Mrs.
Ingram's claims against the IDOC and of Mrs. Ingram's
state-law claims against Rednour (Doc. 12).

In considering a motion to dismiss for failure to state a
claim upon which relief can be granted, the Court accepts
all well-pleaded allegations in a plaintiff's complaint as
true. *See* Fed.R.Civ.P. 12(b)(6); *Cleveland v. Rotman,* 297
F.3d 569, 571 (7th Cir.2002); *Whitwell v. Wal–Mart
Stores, Inc.,* Civil No. 09–513–GPM, 2009 WL 4894575,
at \*2 (S.D.Ill.Dec.11, 2009). The purpose of a Rule
12(b)(6) motion is to decide the adequacy of the
complaint, not the merits of the case. *See Gibson v. City
of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990);
*Morrison v. YTB Int'l, Inc.,* 641 F.Supp.2d 768, 773
(S.D.Ill.2009). A complaint should not be dismissed
unless it either fails to provide adequate notice of a
plaintiff's claim for relief or does not contain "enough
facts to state a claim to relief that is plausible on its face,"
that is, the claim has not been "nudged ... across the line
from conceivable to plausible[.]" *Bell Atl. Corp. v.
Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167
L.Ed.2d 929 (2007). *See also EEOC v. Concentra Health
Servs., Inc.,* 496 F.3d 773, 776 (7th Cir.2007). "While a
complaint attacked by a Rule 12(b)(6) motion to dismiss
does not need detailed factual allegations, a plaintiff's
obligation to provide the ... grounds ... of his ...
entitlement to relief ... requires more than labels and
conclusions, and a formulaic recitation of a cause of
action's elements will not do." *Heinze v. Southern Ill.
Healthcare,* Civil No. 08–672–GPM, 2010 WL 276722,
at \*2 (S.D.Ill. Jan.19, 2010) (quoting *Bell Atl. Corp.,* 550
U.S. at 555) (brackets omitted).

**\*2** With respect to the claims asserted against the IDOC
in this case, the parties agree that the agency is not a
proper party to this suit. "[T]he Eleventh Amendment
prohibits a suit in federal court 'in which the State or one
of its agencies or departments is named as the defendant.'

" *Moore v. Indiana,* 999 F.2d 1125, 1128 (7th Cir.1993) (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). The IDOC, as an Illinois state agency, enjoys immunity from suit in federal court. *See Ford v. Lane,* 714 F.Supp. 310, 313 (N.D.Ill.1989). A state may waive Eleventh Amendment immunity. *See MCI Telecomms. Corp. v. Illinois Bell Tel. Co.,* 222 F.3d 323, 337 (7th Cir.2000). However, Illinois has waived its sovereign immunity only to the extent of authorizing itself to be sued in the Illinois Court of Claims. *See Brooks v. Ross,* 578 F.3d 574, 579 (7th Cir.2009) (citing 705 ILCS 505/8(d)); *Williamson Towing Co. v. Illinois,* 534 F.2d 758, 759–60 (7th Cir.1976). As to Mrs. Ingram's claim against the IDOC under 42 U.S.C. § 1983, that statute provides, in relevant part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. In general, "states and their agencies are not 'persons' subject to suit under 42 U.S.C. § 1983[.]" *Johnson v. Illinois Supreme Court,* 165 F.3d 1140, 1141 (7th Cir.1999) (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 70–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). Also, while it is the case that Congress can abrogate state sovereign immunity, Section 1983 does not abrogate the Eleventh Amendment immunity of a state and its agencies from suit in federal court. *See Quern v. Jordan,* 440 U.S. 332, 338–45, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Meadows v. Indiana,* 854 F.2d 1068, 1070 n. 3 (7th Cir.1988); *Wooden v. Barone,* No. 06–CV–790–JPG, 2007 WL 2481170, at *2 (S.D.Ill. Aug.29, 2007). Accordingly, the claims against the IDOC in this case will be dismissed without prejudice to re-filing them in the Illinois Court of Claims.

With respect to the claims asserted in Mrs. Ingram's complaint against Rednour under the Wrongful Death Act and the Survival Act, the issue for the Court to decide is whether these claims are barred by sovereign immunity. Under the Illinois State Lawsuit Immunity Act ("ISLIA"), 745 ILCS 5/0.01 *et seq.,* the State of Illinois "shall not be made a defendant or party in any court" except as provided in either the Illinois Public Labor Relations Act, 5 ILCS 315/1 *et seq.,* or the Illinois Court of Claims Act, 705 ILCS 505/1 *et seq.* 745 ILCS 5/1. The Court of Claims Act vests exclusive jurisdiction in the Court of Claims in all actions "against the State founded upon any

law of the State of Illinois." 705 ILCS 505/8(a). State sovereign immunity rules apply to state-law causes of action brought in federal court against state officials. *See Omosegbon v. Wells,* 335 F.3d 668, 673 (7th Cir.2003). Under Illinois law, a claim against an individual will be considered a claim against the State of Illinois, even when the individual is sued in his or her individual capacity, if "judgment for the plaintiff could operate to control the actions of the State or subject it to liability." *Loman v. Freeman,* 229 Ill.2d 104, 321 Ill.Dec. 724, 890 N.E.2d 446, 453 (Ill.2008). *See also Feldman v. Ho,* 171 F.3d 494, 498 (7th Cir.1999) (under the ISLIA, in a suit against an official of the State of Illinois, "Illinois treats the state as the real party in interest, provides the public official with absolute immunity, and channels any litigation to the Illinois Court of Claims with the state as the defendant, whenever judgment for the plaintiff would control the state's actions."). The question to be resolved by the Court, then, is whether the state-law claims asserted against Rednour in this case in fact are asserted against the State of Illinois.

**\*3** "While sovereign immunity dictates that the State can be sued only in the Court of Claims, the determination of whether an action is in fact a suit against the State turns upon an analysis of the issues involved and the relief sought, rather than the formal designation of the parties." *In re Lawrence M.,* 172 Ill.2d 523, 219 Ill.Dec. 32, 670 N.E.2d 710, 713 (Ill.1996). Thus, sovereign immunity cannot be avoided "by making an action nominally one against the servants or agents of the State when the real claim is against the State of Illinois itself and when the State of Illinois is the party vitally interested." *Sass v. Kramer,* 72 Ill.2d 485, 21 Ill.Dec. 528, 381 N.E.2d 975, 977 (Ill.1978). An action is against the State of Illinois for sovereign immunity purposes when:

> [T]here are (1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State[.]

*Sneed v. Howell,* 306 Ill.App.3d 1149, 240 Ill.Dec. 203, 716 N.E.2d 336, 340 (Ill.App.Ct.1999). With respect to the first prong of the test, "[a]n employee's actions are considered within the scope of employment where the alleged facts are consistent with an intent to further the state's business." *Sellers v. Rudert,* 395 Ill.App.3d 1041, 335 Ill.Dec. 241, 918 N.E.2d 586, 592 (Ill.App.Ct.2009). Correspondingly, a plaintiff seeking to sue employees of an Illinois state agency must show that the defendants harbored personal animosity toward the plaintiff or that

Ingram v. Illinois Dept. of Corrections, Not Reported in F.Supp.2d (2011)

2011 WL 1519623

they committed the alleged acts for reasons other than what the defendants perceived to be in the best interests of the state agency. *See, e.g., Cortright v. Doyle,* 386 Ill.App.3d 895, 325 Ill.Dec. 874, 898 N.E.2d 1153, 1160 (Ill.App.Ct.2008) (in a suit against employees of the Illinois Department of Children and Family Services ("DCFS"), finding that the defendants' alleged conduct did not exceed the scope of their authority where plaintiff "failed to allege any specific facts in her complaint that showed the supervisors harbored personal animosity toward her or acted for any purpose other than what they perceived to be the best interests of DCFS"). "When the Illinois courts speak of an act 'beyond the scope of authority,' they contemplate an employee acting not just in a wrongful *manner,* but sticking his nose in business where it doesn't belong." *Turpin v. Koropchak,* 567 F.3d 880, 883 (7th Cir.2009) (emphasis in original).

Here, it cannot seriously be disputed that it was within the scope of Rednour's authority as the warden of Menard to supervise, train, and direct IDOC personnel at Menard, to place prisoners at Menard in isolation, to monitor the condition of prisoners in isolation, to see that such prisoners are afforded adequate medical care, and so forth, and all of Rednour's complained-of actions involve matters within Rednour's normal and official functions as an IDOC official. Mrs. Ingram's allegations challenge only the manner in which Rednour carried out his official duties, and she does not allege that Rednour did anything that was beyond the scope of his authority or that Rednour's actions were outside his normal and official functions. *See Branham v. Mengler,* No. 04–2281, 2005 WL 3534223, at *3 (C.D.Ill.Dec.21, 2005) (allegations that a dean at a state university made false promises of tenure to an associate professor were barred by sovereign immunity where the dean had authority to make statements of the general type alleged and thus was acting within the scope of his authority); *Witt v. Correctional Officer Andrew,* No. 99 C 2866, 2000 WL 1349246, at ––––2–3 (N.D.Ill. Sept.19, 2000) ("The court cannot imagine any set of conceivable facts where Andrew's negligent discharge of his shotgun while he was on duty as an armed guard in the prison could be considered outside the scope of the duties imposed upon him by his state employment."); *Healy v. Vaupel,* 133 Ill.2d 295, 140 Ill.Dec. 368, 549 N.E.2d 1240, 1247–48 (Ill.1990) (allegations that athletic directors at a state university negligently failed properly to supervise or train employees, failed to supervise the training and conditioning techniques of gymnasts, including the plaintiff, negligently hired employees of the university's athletic department, failed properly to supervise the rehabilitation of injured athletes, and failed to warn the plaintiff of the dangerous nature of the gymnastic activities the plaintiff was directed to perform concerned matters within the scope of the defendants' authority).

**\*4** Also, the sole source of the duties Rednour is alleged to have breached—as noted, to supervise, train, and direct IDOC personnel at Menard adequately, to monitor the condition of prisoners in isolation, and to see that such prisoners are afforded adequate medical care—is Rednour's employment by the State of Illinois. "Where the charged act of negligence arose out of the State employee's breach of a duty that is imposed on him *solely* by virtue of his State employment, sovereign immunity will bar maintenance of the action in circuit court." *Currie v. Lao,* 148 Ill.2d 151, 170 Ill.Dec. 297, 592 N.E.2d 977, 980 (Ill.1992) (emphasis in original). *See also Turner v. Miller,* 301 F.3d 599, 602 (7th Cir.2002) (holding that sovereign immunity barred a state-law negligence claim against Illinois prison officials brought by a prisoner in IDOC custody to recover for injuries the prisoner allegedly sustained when he was shocked by exposed electrical wires in a prison shower: "the relationship between Turner and the defendants would not have had a source outside the employment status of the defendants, and whatever duty was owed by the defendants to Turner existed because of Turner's status as a prisoner and his presence at Stateville Correctional Center."); *Magdziak v. Byrd,* 96 F.3d 1045, 1049 (7th Cir.1996) (finding that an Illinois state policeman who, while conducting a high-speed chase, killed a third party was entitled to claim sovereign immunity, because "the duties allegedly breached by Byrd relate specifically to his conduct of the high speed chase (rather than his driving in general) and arise solely out of state regulations and police directives."); *Brandon v. Bonell,* 368 Ill.App.3d 492, 306 Ill.Dec. 668, 858 N.E.2d 465, 482 (Ill.App.Ct.2006) (allegations by state prisoners injured by hot grease while working in a prison kitchen that prison kitchen managers breached a duty created by the Illinois Unified Code of Corrections and imposed solely on the IDOC to maintain prison kitchen facilities and adjacent grounds properly were barred by sovereign immunity). *Cf. Jinkins v. Lee,* 209 Ill.2d 320, 282 Ill.Dec. 787, 807 N.E.2d 411, 420 (Ill.2004) (sovereign immunity did not bar a widow's medical malpractice action against mental health professionals employed at a state mental health care facility alleging that the defendants' failure to commit the plaintiff's late husband involuntarily due to mental illness resulted in the husband's suicide, because "the source of the defendants' duty was their status as mental health professionals, rather than their employment by the state."). Because Mrs. Ingram's state-law claims against Rednour allege the breach of duties that arose solely because of Rednour's status as a state prison official, those claims are barred by state sovereign immunity.

Ingram v. Illinois Dept. of Corrections, Not Reported in F.Supp.2d (2011)

2011 WL 1519623

Although Mrs. Ingram argues that, because she alleges that Rednour acted in a willful and wanton manner, this is sufficient to take her claims against Rednour under the Wrongful Death Act and the Survival Act out of the scope of sovereign immunity, the Court does not agree. It is true that, under Illinois law, "malice, if well pleaded, is outside the scope of a State employee's employment." *Management Ass'n of Ill., Inc. v. Board of Regents of N. Ill. Univ.,* 248 Ill.App.3d 599, 188 Ill.Dec. 124, 618 N.E.2d 694, 705 (Ill.App.Ct.1993). *See also Patterson v. Burge,* 328 F.Supp.2d 878, 887 (N.D.Ill.2004) (allegations that the defendants acted "intentionally and maliciously in violation of Illinois state law" withstood a state sovereign immunity challenge); *Hoffman v. Yack,* 57 Ill.App.3d 744, 15 Ill.Dec. 140, 373 N.E.2d 486, 490 (Ill.App.Ct.1978) ("It is here alleged that Yack's actions were deliberate, malicious and not within the scope of his duties. When an employee of the State exceeds his authority by wrongful acts ... the injured party may seek relief from the wrongdoer personally[.]") (collecting cases). However, to plead malice in an Illinois court "there must be specific facts supporting the allegations, which, if proved, would show malicious conduct." *Welch v. Illinois Supreme Court,* 322 Ill.App.3d 345, 256 Ill.Dec. 350, 751 N.E.2d 1187, 1195 (Ill.App.Ct.2001). Here the allegations of Mrs. Ingram's complaint do not state facts giving rise to an inference that Rednour acted with malice. Also, in *Richman v. Sheahan,* 270 F.3d 430 (7th Cir.2001), the court held that a plaintiff's state-law wrongful death and survival claims were barred by

sovereign immunity where the claims were "dependent ... on a theory of wilful and wanton negligence[.]" *Id.* at 442. *See also Robb v. Sutton,* 147 Ill.App.3d 710, 101 Ill.Dec. 85, 498 N.E.2d 267, 271 (Ill.App.Ct.1986) (allegations of willful and wanton conduct assert merely that a state employee behaved in a reckless manner, not a malicious one). The allegations of willful and wanton conduct by Rednour contained in the complaint in this case do not defeat the bar of sovereign immunity.

**\*5** To conclude, the motion to dismiss (Doc. 12) brought by the IDOC and Rednour is **GRANTED.** The claims asserted against the IDOC in Count I, Count II, Count III, Count IV, and Count V of Mrs. Ingram's complaint are **DISMISSED without prejudice.** The claims asserted against Rednour in Count I, Count II, Count III, and Count IV of Mrs. Ingram's complaint are **DISMISSED without prejudice.** Mrs. Ingram's claim under 42 U.S.C. § 1983 against Rednour in his individual capacity in Count V of Mrs. Ingram's complaint remains pending before the Court.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1519623

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Offor v. Illinois Dept. of Human Services, Not Reported in F.Supp.2d (2013)

2013 WL 170000

2013 WL 170000
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois.

OFFOR
v.
ILLINOIS DEPARTMENT OF HUMAN SERVICES, et al.

No. 11 C 7296.
|
Jan. 16, 2013.

**Attorneys and Law Firms**

Paul O. Otubusin, Otubusin and Associates, P.C., Chicago, IL, for Offor.

Chloe G. Pedersen, S. Ann Walls, Illinois Attorney General, Chicago, IL, for Illinois Department of Human Services, et al.

**STATEMENT**

ROBERT M. DOW, JR., Judge.

**I. Background**

**\*1** From March 2003 to November 2010, Plaintiff was employed by Illinois Department of Human Services (IDHS) as a clinical pharmacist. On October 1, 2010, Plaintiff alleges that Defendant Sandra Alvarado, one of his coworkers, told him that he "had not done his inspection." Plaintiff claims to have responded that he knew that he had to do "an inspection" and that Alvarado did not have to remind him. According to the complaint, Alvarado then "charged at Plaintiff, pointed her fingers at Plaintiff's face and was saying all sorts of derogatory statements to the Plaintiff." Compl. ¶ 23. Plaintiff claims

that he didn't respond but "just ignored her and kept his silence." Compl. ¶ 24.

Later that day, Plaintiff was working at the end of a table when Alvarado allegedly "came from nowhere and ordered Plaintiff to get his things off the table for her so that she could start working on [something else]." Compl. ¶ 25. "As usual, Plaintiff was silent and did not respond." Compl. ¶ 26. "All of a sudden, Alvarado pushed the empty cassette forcefully towards the Plaintiff and the force from the cassette pushed Plaintiff's papers and other stuff onto the ground." Compl. ¶ 27. "Plaintiff pushed the cassette back." Compl. ¶ 28. "Alvarado hit Plaintiff with the cassette, also kicked and punched the Plaintiff, and threatened to kill the Plaintiff." Compl. ¶ 29. "Plaintiff maintained his calmness and did not respond." Compl. ¶ 30. The pharmacy staff restrained Alvarado and told her to stop.

Plaintiff and Alvarado were placed on administrative leave. On November 30, 2010, allegedly on Defendant George Enich's recommendation, Defendant Phil Mahalik fired Plaintiff. Alvarado was not fired. Plaintiff is black and from Nigeria, and he claims that he was harassed by Alvarado and fired by his employer because of his race and national origin. In his third amended complaint, Plaintiff alleges violations of Title VII (Counts I and III), 42 U.S.C. § 1981 (Count II), as well as state law claims for breach of contract (Count IV, but mislabeled in his complaint as Count III) and intentional infliction of emotional distress (IIED) (Count V). Defendants have moved to dismiss [35] some of the claims and parties.

**II. Legal Standard**

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir.1990). In reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth v. HSBC Bank Nev., N.A.,* 507 F.3d 614, 618 (7th Cir.2007). To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed.R.Civ.P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355

Offor v. Illinois Dept. of Human Services, Not Reported in F.Supp.2d (2013)

2013 WL 170000

U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E .E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir.2007) (quoting *Twombly,* 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citing *Twombly,* 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.,* 631 F.3d 823, 832 (7th Cir.2011); *cf. Scott v. City of Chi.,* 195 F.3d 950, 952 (7th Cir.1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole."). The same legal standard applies to counter-claims. See *Guarantee Trust Life Ins. v. Insurers Administrative Corp.,* 2010 WL 3834026, at *1 (N.D.Ill. Sept.24, 2010).

### III. Analysis

**\*2** In their motion to dismiss, Defendants argue that (1) Plaintiff's Title VII claims against IDHS and Defendants in their official capacity should be dismissed as redundant; (2) Plaintiff's Title VII claim against Defendant Alvarado in her individual capacity should be dismissed because individuals are not proper defendants under Title VII; (3) Plaintiff's § 1981 race discrimination claim against IDHS and Defendant Saddler in her official capacity is barred by the Eleventh Amendment; (4) Plaintiff failed to state a § 1981 claim against Defendant Alvarado; (5) Plaintiff's state law claims are barred by the Eleventh Amendment; (6) punitive damages may not be awarded against the state; and (7) Plaintiff has not stated a hostile work environment claim.

#### 1. Redundant Official–Capacity Claims

Defendants are correct that Plaintiff's claims against IDHS and the official capacity Defendants are redundant. A suit against an official in his or her official capacity is a suit against the government entity. See *Kentucky v.*

*Graham,* 473 U.S. 159, 165–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. * * * It is not a suit against the official personally, for the real party in interest is the entity."); *Jungels v. Pierce,* 825 F.2d 1127, 1129 (7th Cir.1987) ("the complaint names the mayor as a defendant in his official capacity only, which is the equivalent of suing the city"). "Where the plaintiff names the government entity as a defendant in the suit, the claim against the individual in her official capacity is redundant." *Levin v. Madigan,* 697 F.Supp.2d 958, 973 (N.D.Ill.2010). Having sued IDHS, Plaintiff's claims against Defendants Saddler, Mahlik, and Enich in their official capacities as agents of IDHS are redundant and are therefore dismissed. IDHS, the state agency, is suable in this instance because there is no Eleventh Amendment immunity to suits under Title VII. *Merheb v. Illinos State Toll Highway Authority,* 267 F.3d 710, 711 (7th Cir.2001) (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 448–49, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)).

#### 2. Title VII Claims Against Personal–Capacity Defendants

Plaintiff concedes that Title VII claims against the individual defendants in their personal capacities are improper. See, e.g., *Sebastian v. City of Chicago,* 2008 WL 2875255, at *20–21 (N.D.Ill. July 24, 2008) ("individual defendants are not amenable to suit in their personal capacity under Title VII") (citing *Silk v. City of Chicago,* 194 F.3d 788, 798 n. 5 (7th Cir.1999) ("Our case law is clear that a supervisor cannot be held liable in his individual capacity under the ADA or under Title VII.")). To the extent that Plaintiff has attempted to sue Defendants in their personal capacities under Title VII, those claims are dismissed.

#### 3. Section 1981 Claims for Money Damages Against Illinois

**\*3** Plaintiff's § 1981 claim for money damages against IDHS and Defendant Saddler in her official capacity is barred by the Eleventh Amendment. IDHS is an Illinois state agency and so a suit against IDHS is the equivalent of a suit against the state. Such suits are barred by the Eleventh Amendment. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The same is

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 170000

true for Plaintiff's § 1981 claim for money damages against Defendant Saddler in her official capacity. A suit against an official in her official capacity is equivalent to a suit against the agency she represents—in this case, IDHS, a state agency. Plaintiff's § 1981 claim against Defendant Saddler is therefore barred by the Eleventh Amendment. See, *e.g., Hearne v. Board of Educ. of City of Chicago,* 185 F.3d 770, 776 (7th Cir.1999) (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Kroll v. Board of Trustees of the Univ. of Ill.,* 934 F.2d 904, 909 (7th Cir.1991); *Rucker v. Higher Educ. Aids Bd.,* 669 F.2d 1179, 1184 (7th Cir.1982)).

Plaintiff does not concede Defendants' point, but instead argues that Illinois has waived its Eleventh Amendment immunity from § 1981 claims in 745 ILCS 5/1. Plaintiff is mistaken. See, e.g., *Titus v. Illinois Dept. of Transp.,* 828 F.Supp.2d 957, 967 (N.D.Ill.2011) ("The State of Illinois has not waived its Eleventh Amendment immunity as it relates to Section 1981 claims nor has congress abrogated immunity for Section 1981 claims." (citing 745 ILCS 5/1)).

There is no Eleventh Amendment bar to suits for prospective injunctive relief against a state official sued in his or her official capacity, *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Bruggeman ex rel. Bruggeman v. Blagojevich,* 324 F.3d 906, 912 (7th Cir.2003), and Plaintiff's complaint recites a request for such relief: "Plaintiff respectfully requests that the court provide the following equitable and monetary relief: * * * (b) Order a permanent injunction prohibiting the Defendants * * * from further acts of discrimination; * * * (g) Enter an order requiring the Defendants to implement effective steps to eliminate and remediate race discrimination from the Defendant's organization." Compl. at 8.

"To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.,* 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009); *Vasich v. City of Chicago,* 2013 WL 80372, at *8 (N.D.Ill. Jan.7, 2013). Plaintiff no longer works at IDHS and has not asked for reinstatement. See *Humphrey v. Elgin Mental Health,* 2011 WL 1768805, at *2 (N.D.Ill. May 9, 2011). He is not, in other words, under a real or immediate threat of future harm. See *Titus,* 828 F.Supp.2d at 967; *Sierakowski v. Ryan,* 223 F.3d 440, 445 (7th Cir.2000). Plaintiff seeks damages for discriminatory

discharge and injuries related to his discharge; that is plain from his complaint and his brief in opposition to Defendants' motion to dismiss. His tacked-on demand that the Court order IDHS to follow civil rights laws in the future does not state a claim for injunctive relief. See *Vasich,* 2013 WL 80372 at *9. Setting aside whether Plaintiff would have standing to seek such relief, he has not alleged that any discriminatory practices will persist in the future, as would be necessary to state a claim for injunctive relief. *Id.*

**4. Section 1981 Claim against Defendant Alvarado**

**\*4** Defendants argue that Plaintiff has failed to state a § 1981 claim against Defendant Alvarado. Defendants' argument is that Plaintiff's § 1981 claim is for discriminatory discharge and that Plaintiff has not alleged that Alvarado—his coworker, not his boss—caused him to be fired. Like Plaintiff, Alvarado was suspended after their scuffle. The problem, it seems, was that Alvarado was allowed to resume working at IDHS after the suspension and Plaintiff was not. See, *e.g.,* compl. ¶ 34.

"Because there is no respondeat superior or supervisory liability in the context of §§ 1981 and 1983, a plaintiff must show that *each* defendant, through that defendant's own individual actions, intended to discriminate on the basis of a protected class." *Sommerfield v. City of Chicago,* 2011 WL 4553021, at *2 (N.D.Ill. Sept.29, 2011). The Court agrees with Defendants that Plaintiff has not alleged that Alvarado caused his wrongful discharge. Thus, insofar as Plaintiff's § 1981 claim is for wrongful discharge, Plaintiff has not stated a claim against Alvarado.

**5. State Law Claims**

Defendants argue that sovereign immunity bars Plaintiff's state law claims for breach of contract and intentional infliction of emotional distress against IDHS and the official-capacity Defendants. Defendants are correct. As already mentioned, a suit against IDHS is the equivalent of a suit against the state for immunity purposes, and a suit against IDHS officials in their official capacity is equivalent to a suit against the agency itself. The Eleventh Amendment prohibits a federal court from adjudicating state law claims against the state and its agencies where, as here, it does not consent. See, *e.g., Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104

S.Ct. 900, 79 L.Ed.2d 67 (1984); *Scott v. O'Grady,* 975 F.2d 366, 369 (7th Cir.1992) ("All suits against a state or its agencies are barred by the Eleventh Amendment unless the state consents to suit in federal court or Congress uses its powers under the Fourteenth Amendment to abrogate the state's Eleventh Amendment immunity."); *Lowe v. Cook County Circuit Court Clerk,* 2000 WL 1372860, at *5 (N.D.Ill. Sept.22, 2000) (claims for breach of contract and intentional infliction of emotional distress against Illinois state agency dismissed based on doctrine of sovereign immunity); 745 ILCS 5/1; 745 ILCS 5/1.5.

### 6. Punitive Damages

Defendant argues that punitive damages may not be awarded against the state. Plaintiff agrees and has withdrawn his request for punitive damages against IDHS and the official-capacity defendants. See, *e.g., Baker v. Runyon,* 114 F.3d 668, 669 (7th Cir.1997); 42 U.S.C. § 1981a(b)(1) ("A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.").

### 7. Hostile Work Environment

**\*5** Offensive discriminatory behavior in the workplace may give rise to an actionable claim under Title VII or § 1981 for a "hostile work environment." See, e.g., *Smith v. Sheahan,* 189 F.3d 529, 532–33 (7th Cir.1999). To support a claim, the alleged conduct must be severe or pervasive. *Id.* Defendants devote a section of their motion to the proposition that Plaintiff has failed to allege a hostile work environment claim. Plaintiff appears to

concede the point. Plaintiff did use the phrase "hostile work environment" in his complaint and in his brief opposing Plaintiff's motion to dismiss, but only in generally introducing the complaint, see compl. ¶ 16, and in supporting his allegation of intentional infliction of emotional distress, see dkt. 38 at 9–10. For instance, in a section of his response brief titled "Plaintiff Has Stated A Cause of Action For Intentional Infliction of Emotional Distress," Plaintiff argues that "[t]he hostile work environment created by Defendant caused Plaintiff to have severe headaches, stress, anxiety, emotional distress, restlessness, fatigue, irritability, insomnia, and situational depression."

In short, Plaintiff does not challenge Defendants' assertion that Plaintiff has not alleged a hostile work environment *claim* under Title VII or § 1981, even if he maintains that he has been injured by Defendants' "hostility." The Court also notes that although one event may create a hostile work environment, see *EEOC v. International Profit Associates, Inc.,* 2008 WL 4876860, at * 7 (N.D.Ill. July 14, 2008), the conduct complained of here does not appear to be sufficiently egregious. Recall that according to Plaintiff's complaint, Plaintiff's coworkers came to Plaintiff's aid during Alvarado's outburst, restrained Alvarado, and told her to stop.

### IV. Conclusion

For the reasons stated above, Plaintiff has stated a Title VII claim against IDHS and an IIED claim against Defendant Alvarado. Plaintiff's other claims are dismissed and, to that extent, Defendants' motion to dismiss [35] is granted.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 170000

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.