**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| KAREN SAM & ROBERT SAM,<br><br>Plaintiffs,<br><br>v.<br><br>DEKALB HOUSING AUTHORITY, et al.<br><br>Defendants. | Case No. 3:25-cv-50219<br><br>Honorable Iain D. Johnston |

## MEMORANDUM OPINION AND ORDER

The Court previously dismissed two complaints from Plaintiffs Karen and Robert Sam without prejudice. Dkts. 61, 79. The Sams, proceeding *pro se*, now bring this Second Amended Complaint against the Housing Authority of the County of DeKalb (HACD) alleging violations of their procedural due process rights, Title II of the Americans with Disabilities Act (ADA), and Section 504 the Rehabilitation Act. Dkt. 80. HACD moves to dismiss their claims under Rule 12(b)(6). Dkt. 84. For the following reasons, HACD's motion is granted in part and denied in part.

### I. Background[1]

The Sams, while residing in Sycamore, Illinois, participated in the Housing Choice Voucher Program (Voucher Program) administered by HACD. Dkt. 80 at ¶¶

[1] These facts are taken from the Second Amended Complaint [80]. The Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in favor of the plaintiff. *Hughes v. Northwestern Univ.*, 63 F.4th 615, 630 (7th Cir. 2023).

13–14, 23. Through that program, HACD made housing assistance payments directly to the Sams' landlord. *Id.* at ¶ 7.

Unfortunately, conditions within the Sams' subsidized residence were bleak. The Sams dealt with water intrusion, excess moisture, mold, inadequate hot water, roofing defects, weather-tightness failures, and structural deterioration. *Id.* at ¶¶ 3, 34. The Sams complained to city inspectors, who documented these unsafe conditions. *Id.* at ¶ 3. Yet the landlord refused to make repairs. *Id.* at ¶ 38.

This situation was especially problematic for Karen Sam, who suffers from several disabling medical conditions, including Common Variable Immune Deficiency, severe mobility limitations, and autoimmune complications. *Id.* at ¶ 2. Repeated moisture intrusions worsened Karen's health and made continued occupancy medically unsafe. *Id.* at ¶ 27.

Because of these dangerous conditions, the Sams sought to move. *Id.* at ¶¶ 5, 45. So, in June 2023, they asked HACD to port their voucher—a process by which Voucher Program participants can transfer their rental subsidy to a different public housing authority's jurisdiction. *Id.* HACD denied the Sams' request, telling them they were ineligible to port because of unpaid rent and "bad standing" with their landlord. *Id.* at ¶¶ 6, 58.

This denial prompted a lengthy series of pleas by the Sams, asking HACD to change its determination. *Id.* at ¶¶ 19–21. From June 2023 through 2025, the Sams sent communications to "HACD case manager Alexis Moreland, HACD Executive Director David Siegel, HACD attorney Timothy Horning, [and] board members J.

Morgan, J. Wahlstrom, M. Bringas, S. Nicholson, H. Hadjegan, Mrs. Bemis, and Mrs. Sauter." *Id.* at ¶ 19. Some of these communications were apparently answered, with HACD telling the Sams they were ineligible to port. *Id.* at ¶¶ 6, 55. Other communications "went unanswered for months and, in some cases, over a year." *Id.* at ¶ 31.

The Sams raised several issues throughout these communications. First, the Sams disputed that they owed rent or were in "bad standing" with their landlord. *Id.* at ¶ 60. Second, they objected to HACD's eligibility determination process because they never had a means to challenge the decision. *Id.* at ¶ 74. Specifically, HACD never provided (1) "a formal written program violation determination," (2) "adequate written notice identifying the evidentiary basis for portability denial," (3) "a meaningful grievance hearing," (4) "a meaningful opportunity to contest the allegations supporting portability denial," or (5) "a constitutionally sufficient opportunity to present objections and supporting information." *Id.* at ¶ 91. Third, they stressed that their current residence posed an urgent threat to Karen's health. *Id.* at ¶ 37. Along those lines, the Sams specifically stated that portability was requested as an accommodation for Karen's disability. *Id.* at ¶ 27.

The Sams did their best to raise these grievances to the top of HACD. They allege that they "communicated with HACD supervisory personnel and board officials" and that supervisory personnel "approved, ratified, or knowingly permitted the continued denial of portability and grievance-related protections." *Id.* at ¶¶ 20, 96.

Ultimately, the Sams' requests went unheeded, they lost their voucher, and were displaced. As a result, they suffered continued exposure to unsafe housing conditions, housing instability, medical harm, emotional distress, financial hardship, and out-of-pocket expenses. *Id.* at ¶¶ 57, 127. The Sams currently face homelessness as they go through "yet another eviction." *Id.* at ¶ 82.

## II. Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the complaint for failure to state a claim upon which relief may be granted. To withstand a motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim for relief is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When ruling on 12(b)(6) motions, the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Hughes*, 63 F.4th at 630. Although plaintiffs "need not plead 'detailed factual allegations' to survive a motion to dismiss," they must do more than recite the elements of a cause of action. *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). Rather, a plaintiff must allege facts that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

The defendant, as the moving party, bears the burden of establishing that the complaint's allegations, taken as true, are insufficient. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021). Complaints brought by *pro se* plaintiffs, like the Sams, are construed liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## III. Analysis

### *A. Count I – Procedural Due Process, 42 U.S.C § 1983*

The Sams allege that HACD violated their Fourteenth Amendment due process rights by finding the Sams ineligible for portability assistance without giving them an opportunity to contest HACD's determination. To state a claim for a violation of procedural due process, the Sams must plead enough facts to suggest that HACD deprived them of a protected interest with "insufficient procedural protections surrounding that deprivation." *Cannici v. Vill. of Melrose Park*, 885 F.3d 476, 479 (7th Cir. 2018) (quoting *Michalowicz v. Vill. of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008)). HACD challenges the Sams' pleading on two grounds: (1) that they fail to allege a basis for municipal liability under *Monell*; and (2) that alternative state remedies have already afforded them sufficient procedural protections.

1. Monell

The Sams bring their procedural due process claim against HACD under 42 U.S.C § 1983, which authorizes actions against any person who causes a constitutional deprivation under color of state law. Since the Supreme Court's holding in *Monell v. Dep't of Soc. Servs. of City of New York*, units of local

government have been considered "persons" subject to liability under § 1983. 436 U.S. 658, 690 (1978). Crucially, however, local governments are only liable for constitutional violations that they cause themselves—they are not liable for violations caused by their employees under a theory of *respondeat superior*. *Id.* at 691–92. For a local government to face *Monell* liability for a constitutional violation, the violation must arise "via an official policy or custom." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010).

The Seventh Circuit has interpreted *Monell*'s policy or custom standard to include three categories of action fairly attributable to a local government: (1) an express policy; (2) a widespread practice so permanent and well-settled that it constitutes a custom or practice; or (3) the act of a person with final policymaking authority. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021).

Neither of the first two categories apply in this case. As to the first category, the Sams do not identify any express policy causing their deprivation.

As to the second, the Sams do not allege that HACD's failure to provide them with due process is part of a widespread practice. Indeed, the Second Amended Complaint references no HACD determinations beyond those relating to the Sams' eligibility. Although there is "no clear consensus" on how many occurrences make up a widespread custom or practice, "it must be more than one instance, or even three." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (cleaned up). In this case, the Sams allege only a single violation. At best, the Sams

point out that they "repeatedly" communicated their need for different housing, that they "repeatedly" expressed their disagreement with HACD's determination, and that HACD "repeatedly" declined to reconsider. Dkt. 80 at ¶¶ 1–2, 5–8, 21, 24, 26, 29, 32–33, 35, 37, 42–43, 45–48, 52–53, 55–56, 60–68, 71–74, 78, 80, 88–89, 92–93, 95, 99, 105–109, 113, 120–122.[2] But these allegations are not enough to suggest a widespread custom or practice—repeated communications about a single eligibility determination do not somehow transform that one determination into several.

So, only the third category remains: action by a final policymaker. This category does not require a widespread or broadly applicable policy. Rather, "municipal liability may be imposed for a single decision by municipal policymakers to adopt a course of action tailored to a particular situation." *Bradley v. Vill. of Univ. Park*, 929 F.3d 875, 884–85 (7th Cir. 2019) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986)) (cleaned up). Such liability "attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible." *Pembaur*, 475 U.S. at 483.

To proceed, the Sams must allege enough factual matter to suggest that a final policymaker is responsible for their portability denial. To that end, the Sams allege that that "HACD's actions and omissions were undertaken pursuant to

[2] The Second Amended Complaint is highly repetitious. Indeed, it is painfully repetitious. This may be the result of reliance on generative AI. Litigants should consider Rule 8's directive that pleadings contain "a short and plain statement" showing entitlement to relief and that each allegation be "simple, concise, and direct." Fed. R. Civ. P. 8(a), (d)(1). The Court cautions the Sams on blind reliance on GenAI. GenAI is only a tool. The Sams remain responsible for the allegations in their pleadings and discovery requests and responses. Fed. R. Civ. P. 11; Fed. R. Civ. P. 26(g). Blind reliance on GenAI is done so at their peril.

official decision-making authority." Dkt. 80 at ¶ 95. They also point to a host of candidates who may have been responsible for their eligibility determination or, at the very least, received communications about it: "HACD case manager Alexis Moreland, HACD Executive Director David Siegel, HACD attorney Timothy Horning, [and] board members J. Morgan, J. Wahlstrom, M. Bringas, S. Nicholson, H. Hadjegan, Mrs. Bemis, and Mrs. Sauter." *Id.* at ¶ 19.

Unfortunately, the Sams aren't clear about which of these people they allege was the final policymaker. It can't be true that everyone they name is a final policymaker for all purposes—what defines a final policymaker is that their decisions are not subject to review by anyone else. *See Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011). Broadly applying the label "official decision-making authority" to all actions by HACD personnel isn't enough.

The only plausible final policymaker is HACD's board. Whether or not an official has final policymaking authority is a question of state law. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)). Under Illinois law, a public housing authority's policymaking power rests with its board of commissioners. *See Triad Assocs. v. Chicago Hous. Auth.,* No. 87 C 5096, 1992 U.S. Dist. LEXIS 17598, at *8 (N.D. Ill. Nov. 13, 1992), *aff'd sub nom. Triad Assocs., Inc. v. Robinson*, 10 F.3d 492 (7th Cir. 1993); *see also Castro v. Chicago Hous. Auth.*, 360 F.3d 721, 725 (7th Cir. 2004)

(describing "policymaking," as "normally within the power of the [Chicago Housing Authority's] Board of Commissioners").[3]

Beyond HACD's board, the Sams fail to allege enough facts to suggest that anyone else has final policymaking authority. To be sure, the Second Amended Complaint does name attorney Timothy Horning and Executive Director David Siegel as being among HACD's "supervisory" officials. Dkt. 80 at ¶¶ 21, 29. But having provided only their titles, the Sams fail to plausibly suggest that either are final policymakers. For one, the title of "attorney" is not enough to support a reasonable inference that Horning is a final policymaker. A lawyer's authority to represent a client is "not the same as being responsible for establishing final policy." *See Teesdale v. City of Chicago*, 690 F.3d 829, 835 (7th Cir. 2012) (cleaned up). Without more facts, the Sams' choice to label Horning as "decision-making personnel," is just that: a label. Dkt. 80 at ¶ 21. The same is true for Executive Director Siegel. Although the title "Executive Director" does suggest Siegel holds some kind of authority, it doesn't suggest how much, over what, and, critically, whether that authority is subject to board review. *See Marsden v. Kishwaukee Cmty. Coll.*, 572 F. Supp. 3d 512, 524 (N.D. Ill. 2021) (dismissing claim because plaintiff failed to allege how policymaking authority rested with college president).[4]

---

[3] The Court may take judicial notice of the fact that HACD is a public housing authority organized under Illinois' Housing Authorities Act. 310 Ill. Comp. Stat. 10/1 et seq. The Act empowers local governments, subject to state approval, to create authorities tasked with remediating various housing-related ills. 310 Ill. Comp. Stat. 10/3. Such authorities are "governed by a five-man board of commissioners, which enjoys broad powers in the management of the projects." *Brown v. Kirk*, 355 N.E.2d 12, 14 (Ill. 1976).

[4] Of course, it's also conceivable that HACD's board could delegate authority to someone like an Executive Director. Indeed, the Illinois Housing Authorities Act authorizes the board to appoint a "chief executive officer" and delegate certain managerial power to them. 310 Ill. Comp. Stat. 10/6.

With HACD's board of commissioners being the only plausible final policymaker, the question is then whether the Sams' allegations suggest that the board was responsible for denying them due process. The Second Amended Complaint makes this question difficult for one overarching reason: Frequently, it names specific HACD personnel who received communication from the Sams—but it never clearly says who talked back.

On one hand, when the Sams describe the myriad protests they made *to* HACD, they name names. They allege, for instance, "at least 30 to 40 emails sent to Alexis Moreland, David Siegel, and HACD Board members." Dkt. 80 at ¶ 31. In addition, they name seven current or former board members as "receiving communications." *Id.* at ¶ 19.

By contrast, when the Second Amended Complaint describes communications or determinations issued *from* HACD, it only ever refers to "HACD" generally or "HACD personnel and supervisory officials." *E.g.*, *id.* at ¶¶ 61, 63. At best, the Sams allege they "communicated with . . . board officials concerning portability, accommodation-related concerns, and requests for grievance review." *Id.* at ¶ 20. Yet it's never said whether this communication was a two-way street or part of their long series of ignored emails. The upshot is that it's unclear who or what was making determinations on behalf of HACD. The Sams never specifically attribute an action to the board, but they also never attribute an action to anyone else.

---

But, in this case, the Sams allege no delegation to other HACD personnel, either expressly or by custom. *See Marsden*, 572 F. Supp. 3d at 525 (finding no delegation because complaint didn't allege "who delegated what authority to whom and under what circumstances").

Reading the Second Amended Complaint's language literally, the Sams' allegations could describe at least four different scenarios: (1) HACD's board never responded to the Sams' grievances and any responsive communications came from subordinate employees; (2) HACD's board responded to the Sams' communications, but only to brush off the Sams; (3) HACD's board responded to the Sams' communications, but only to reiterate their subordinates' denial; or (4) HACD's board substantively responded to the Sams, denying them a chance to challenge their eligibility determination.

Only in this last scenario—where the board substantively rejected the Sams—would the Second Amended Complaint support an inference of policymaker action. Brushing the Sams off or failing to investigate subordinates' decisions would not be enough to infer that the board made a "deliberate choice . . . among various alternatives." *Pembaur,* 475 U.S. at 483. Passive approval of a subordinate's decision is not enough to impose municipal liability; if it were, "then virtually any action by a municipal employee could become chargeable to the municipality." *Waters v. City of Chicago*, 580 F.3d 575, 585 (7th Cir. 2009). By contrast, a more active approval by a policymaker may result in ratification: That occurs if the authority approves both a subordinate's decision and the basis for the decision. *Reardon v. Danley,* 74 F.4th 825, 828 (7th Cir. 2023). A substantive denial from the board, after notice of the Sams' grievances, would support an inference that the board made a deliberate choice, or at least ratified their subordinates' decision.

So then, does the Second Amended Complaint allege that the board substantively rejected the Sams? The pleading standard tilts the balance toward yes. Recall that the Sams, proceeding without counsel, are entitled to a liberal construction of their pleading. *Erickson*, 551 U.S. at 94. In addition, courts have repeatedly cautioned that a heightened pleading standard does not apply to *Monell* claims. *White v. City of Chicago*, 829 F.3d 837, 843–44 (7th Cir. 2016). Rather, the plaintiff's task has always been to give the defendant fair notice of the claims against them. *Childress v. Walker*, 787 F.3d 433, 440–41 (7th Cir. 2015). This standard is particularly relevant to *Monell* claims because plaintiffs are unlikely to have access to specific facts about internal government decision-making processes.

Reading their pleading under the appropriate standard—when the Sams say "HACD" repeatedly denied their requests for process, they mean everyone they communicated with at HACD, including the board. This reading is the liberal construction of the pleading both because it is the broader interpretation of the Sams' words and because it tilts toward relief. Consequently, it's the reading the Court must adopt.

Admittedly, as a matter of common sense, it seems unlikely that a public housing authority's board would be deciding whether individual residents could contest portability determinations. Yet it's not Court's job to test allegations for probability. *Hughes*, 63 F.4th at 630. Because the Sams have alleged that the board substantively denied their requests, the Court can reasonably infer that the board knew of the Sams' grievances, considered whether to grant them due process, and

decided not to.[5] Such a decision triggers *Monell* liability, either directly or under a ratification theory.

The Court is satisfied that this reading of the Second Amended Complaint doesn't deprive HACD of notice. After all, the Sams name seven board members, reiterate a long history of grievances, and repeatedly reference "supervisory" and "official decision-making authority." *E.g.*, dkt. 80 at ¶ 95. It's clear what they're trying to get across, however imprecise the pleading. Should discovery reveal that the board was not responsible for denying the Sams a review process, this case will likely meet a swift demise. For now, the Sams allege a policy or custom for *Monell* purposes, albeit barely.

2. *Alternative State Remedies: the* Parratt *Defense*

HACD also argues that the Sams have failed to allege they were denied due process. They rely on a line of cases, stemming from *Parratt v. Taylor*, which held that "random and unauthorized" deprivations of property don't give rise to a § 1983 claim if a state tort suit can provide a post-deprivation remedy. 451 U.S. 527, 540–543 (1981)*; see also Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (extending

[5] HACD points out that denying the Sams a hearing to contest their portability determination would be against HACD policy. They ask the Court to take notice of HACD's Administrative Plan, which provides that portability refusals like this one can be contested via an "Informal Review" process. Hous. Auth. of the Cnty. of DeKalb, *Admin. Plan for the Section 8 Hous. Choice Voucher Program*, at 16-8–16-11 (Nov. 16, 2021). HACD argues therefore that any denial of review is a frustration rather than an implementation of the board's authority. Dkt. 89, at 4. This point would be relevant if the Sams alleged that subordinate HACD employees were acting on delegated authority from the board (because it would suggest those employees exceeded the scope of the delegation). *See Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992). But no such delegation is alleged. So only the Board's actions matter. HACD's board does not strip its own policymaking authority by approving an administrative plan and then acting contrary to that plan. *Cf. Betts*, 178 F.4th at 1057–1060 (clear command in *state statute* can strip policymaker's authority over a given area). The allegations in this case simply cause the Court to infer that HACD's board did not follow the Administrative Plan.

*Parratt*'s reasoning from negligent to intentional deprivations). HACD argues that the deprivation in this case is "random and unauthorized" because denying the Sams a hearing would contravene federal regulations and HACD policy. Then, because it appears the Sams could sue HACD under Illinois' common law writ of certiorari, HACD argues that they already have enough procedural protections available. *See Tolliver v. Hous. Auth. of Cnty. of Cook*, N.E.3d 1220, 1225 (Ill. App. Ct. 2017).

A closer look at *Parratt* quickly reveals that HACD's reliance is misplaced. Although the violation alleged in this case is random insofar as it is weird, it is not random in the sense meant by *Parratt*. *Parratt* involved the destruction of prisoner property by correctional officers during a mail room mix-up. 451 U.S. at 530. Its successor, *Hudson,* involved the same during a prison cell "shakedown." 468 U.S. at 519–20. The Court reasoned that under these circumstances "predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Id.* at 533. Because a hearing is not practical in the middle of a prison cell shakedown, the Court determined post-deprivation damages were the only viable remedy. *Id.* at 531–32. Then, because state law provided such post-deprivation damages, the Court reasoned no further process was due. *Id.*

This case looks nothing like *Parratt*. HACD provides no reason, and the Court can think of none, why pre-deprivation process would be impossible in this case. The events in question took place over the course of months, and mostly by email. What's more, the Sams can point to "a specific, predictable point" that should

have triggered a hearing: their request for portability. *Zinermon v. Burch*, 494 U.S. 113, 136–38 (1990). *Parratt* does not control when a pre-deprivation hearing was plainly possible at such a point. *See id.* at 136–38. Taken together, the Sams' alleged deprivation is wholly unlike an unpredictable tort. Indeed, the only thing this case has in common with *Parratt* and *Hudson* is that the alleged violation may prompt a suit in state court. But even if "the alleged wrongdoing also violated state law and could support a tort claim [that would not be] sufficient to invoke the *Parratt* doctrine." *Armstrong v. Daily*, 786 F.3d 529, 539 (7th Cir. 2015).[6]

This case's dissimilarity to the *Parratt* line of cases is dispositive. The Seventh Circuit has instructed that "*Parratt* is limited to a narrow category of due process cases where . . . the very notion of a pre-deprivation hearing would be impractical and even nonsensical." *Id.*[7] A broader reading of *Parratt* "would bar virtually all § 1983 due process claims so long as state law offers some post-deprivation remedy." *Id.* at 542. Such a result would run against the Supreme Court's holding that "the federal remedy under § 1983 'is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.'" *Id.* (quoting *Monroe v. Pape*, 365 U.S. 167, 183 (1961)). The Court rejects HACD's invocation of the *Parratt* defense.

---

[6] It has, of course, not been shown (or even alleged) that the wrongdoing in this case violated state law and could support a tort claim. Such a determination is not necessary to dispense with the *Parratt* defense.

[7] HACD cites *Calderone v. City of Chicago*, which ostensibly applies the *Parratt* defense without analyzing whether a pre-deprivation hearing would be impractical or nonsensical. 979 F.3d 1156, 1166 (7th Cir. 2020). But no such analysis was necessary in that case the because the plaintiff "readily admit[ted]" the alleged violations were "random and unauthorized." *Id.* at 1165. The Sams have not made a similar admission. Accordingly, the Court follows *Armstrong*'s directive to consider the viability of pre-deprivation remedies.

HACD's Motion to Dismiss is denied with respect to Count I.

*B. Counts II & III – Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794*

Next, the Sams allege that HACD violated the ADA and Rehabilitation Act by failing to port their voucher, which Karen Sam needed to leave her medically unsafe housing. The ADA and Rehabilitation Act treat discrimination similarly, so the Court addresses both claims together. *See Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 967 (7th Cir. 2018). To state a claim for discrimination under either statute, the Sams must plead enough facts to plausibly suggest that, because of a disability, they were subject to "(1) disparate treatment; (2) disparate impact; or (3) a refusal to make a reasonable accommodation." *Id.* The Sams allege no disparate treatment or accommodation, so they hang their hat on a reasonable accommodation theory.

To state a claim based on a reasonable accommodation theory, the Sams must allege that (1) Karen Sam is a qualified individual with a disability who, (2) because of her disability, (3) was denied access to a program or activity by HACD's refusal to make a reasonable accommodation. *See Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). The Second Amended Complaint repeatedly alleges that Karen was a qualified individual with a disability and that HACD refused her desired accommodation. *E.g.*, dkt. 80 at ¶ 2. Thus, the remaining questions are whether the requested accommodation was reasonable and whether Karen's denial of services was because of her disability.

The Seventh Circuit has "consistently held" that the statutory language in both the Rehabilitation Act and the ADA includes a causation element. *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 593 (7th Cir. 2018). This means that the duty of reasonable accommodation in public programs is confined to "rules, policies, etc. that hurt handicapped people *by reason of their handicap*, rather than . . . by virtue of what they have in common with other people, such as a limited amount of money to spend on housing." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 561 (7th Cir. 2003) (quoting *Hemisphere Bldg. Co. v. Vill. of Richton Park*, 171 F.3d 437, 440 (7th Cir. 1999)) (emphasis in original). For example, a disabled student denied attendance at her desired school because of a neutral residency requirement cannot force the school district to waive its residency requirement as an accommodation. *H.P. by & Through W.P. v. Naperville Cmty. Unit Sch. Dist. #203*, 910 F.3d 957, 961 (7th Cir. 2018). Whether the student was disabled or not, she would be denied attendance because of her residency—"a fact unrelated to her disability." *Id.* To interpret the statutory directives otherwise would be to compel subsidies rather than eliminate discrimination. *See Hemisphere Bldg. Co.*, 171 F.3d at 440.

HACD correctly argues that the Sams have not alleged that the purported failure to accommodate was related to Karen's disability. Rather, the Sams allege they were denied portability because HACD determined they owed rent and thus were ineligible to port under program rules. Dkt. 80 at ¶ 60.[8] As alleged, their

[8] The Sams dispute whether they had an unpaid rent balance. Dkt. 80 at ¶ 6. Those disputes are not alleged to be related to their disability and are addressed by Count I.

deprivation was caused not by reason of disability, but by virtue of what they have in common with many others, a limited amount of money to spend on housing.

The Sams do not allege that HACD caused the unsafe housing conditions, for a discriminatory reason or otherwise. Nor do they allege that they were denied portability because of Karen's disability. They do not even allege that they were denied grievance review because of her disability. Rather, their allegations amount to a claim that being denied portability has caused them extra harm because of Karen's disability. That is not discrimination. Rather, it reflects a sad reality that adverse determinations often have a greater impact on people with disabilities. For example, increased costs of living can make things worse for disabled people who are denied a visa, lose their job, or become incarcerated. This reality, of course, does not transform an otherwise neutral determination into actionable discrimination.

The Sams attempt to bypass the causation requirement by reframing the extra harm they suffered as a denial of "meaningful and equal access to safe housing benefits available through the . . . Voucher Program." *Id.* at ¶ 36. But this misunderstands the benefit that the Voucher Program provides. Participation in the program does not guarantee suitable housing—instead it provides a package of services. *Louis v. New York City Hous. Auth.*, 152 F. Supp. 3d 143, 153 (S.D.N.Y. 2016); *Taylor v. The Hous. Auth. of New Haven*, 267 F.R.D. 36, 57–58 (D. Conn. 2010); *Liberty Res., Inc. v. Philadelphia Hous. Auth.*, 528 F. Supp. 2d 553, 567–68 (E.D. Pa. 2007); *see also Alexander v. Choate*, 469 U.S. 287, 303 (1985) (describing Medicaid benefit as "package of services" rather than adequate health care for

Rehabilitation Act claim). As relevant in this case, that package includes housing assistance payments and the ability for voucher holders to port their subsidy to another jurisdiction *if* they are eligible. The Sams, by their own allegations, have received the same package of services as anyone else.

Counts II and III are dismissed with prejudice.[9]

## IV. Conclusion

For the above reasons, HACD's motion is granted in part and denied in part. The Sams' ADA and Rehabilitation Act claims are dismissed with prejudice. Their procedural due process claims may proceed.

Entered: October 5, 2026

By: ______________________
Iain D. Johnston
U.S. District Judge

[9] The Court advised the Sams that this Second Amended Complaint would be their final opportunity to plead a claim. Dkt. 79; *see Bank of Am., N.A. v. Knight*, 725 F.3d 815, 819 (7th Cir. 2013) ("in court, as in baseball, three strikes and you're out").